**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALBERT GREENWOOD BROWN,
       *Petitioner-Appellant,*

v.

STEVEN W. ORNOSKI, Warden,
       *Respondent-Appellee.*

No. 05-99008

D.C. No.
CV-94-08150-ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
June 14, 2007—San Francisco, California

Filed September 19, 2007

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins

## COUNSEL

Jan B. Norman, Los Angeles, California, for the petitioner-appellant.

Barry J.T. Carlton, Supervising Deputy Attorney General, San Diego, California, for the respondent-appellee.

**OPINION**

HAWKINS, Circuit Judge:

Petitioner Albert Greenwood Brown, Jr. ("Brown") was convicted in California and sentenced to death for the rape and murder of a fifteen-year-old girl. The district court denied his petition for a writ of habeas corpus, but granted a certificate of appealability ("COA") on two claims that Brown received ineffective assistance of counsel in the sentencing phase of his trial. We expanded the COA to include two additional claims, one also involving penalty phase ineffective assistance of counsel, and another involving Brown's claim that lethal injection violates the Eighth Amendment. We affirm the district court's denial of the writ.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

On October 28, 1980, about 7:30 a.m., 15-year-old Susan Jordan left her home to walk to Arlington High School. *People v. Brown*, 40 Cal. 3d 512, 522 (1985). She never arrived, and efforts throughout the day to locate her were unsuccessful. That evening, Susan's mother answered the telephone and a caller asked "Hello, Mrs. Jordan, Susie isn't home from school yet, is she?" Mrs. Jordan replied that she was not. The voice then declared, "You will never see your daughter again. You can find her body on the corner of Victoria and Gibson." At Mrs. Jordan's request, the caller repeated the information, then hung up. Within a half-hour, another call said, "On the corner of Gibson and Victoria, fifth row, you will find a white Caucasian body of a young girl in the orange grove." *Id.*

While police officers were at the Jordan home later that evening, a third call was received. The caller said, "You can find Sue's identification in a telephone booth at the Texaco station at Arlington and Indiana." *Id.* Officers were sent to the Texaco station, where they discovered two Arlington High

School identification cards belonging to Susan and a library pouch from a book. *Id.* at 523.

Meanwhile, a police dog found Susan's body lying face down in the orange grove, with dirt piled up on both sides of her head. The body was nude below the waist except for socks, and Susan's bra was partially pulled out from under her blouse. Her jeans were located elsewhere in the grove. A shoelace, apparently from one of her shoes, was wrapped tightly around her neck. Homicide investigators found signs of a struggle and indications that the body had been dragged for some distance. *Id.* at 522-23.

About 9:30 p.m., another call was received at Susan's home, stating "In the tenth row, you'll find the body." The Jordans were able to record this call. Two acquaintances of Brown later identified the voice on the taped call as that of Brown. *Id.* at 523, 525.

Early the next morning, the police set up roadblocks on the streets near the grove and questioned passersby. Witnesses recalled seeing a black man approaching Susan on the bike trail, standing in the grove as she walked by, or following her. Witnesses also reported seeing a brown Trans Am in the vicinity on that date, which matched the description of Brown's car. Witnesses also described the man they had seen in the area as wearing jogging clothes, some particularly describing green running shorts and a green and white shirt. *Id.* at 523.

The investigation quickly focused on Brown. About a week after the murder, the authorities obtained a search warrant for Brown's residence. Inside the house, a telephone directory was turned back to the page containing the Jordans' listing. There were newspaper articles about Susan's death under Brown's bed, and two of her missing schoolbooks were found in the den. The library pouch found in the telephone booth had come from one of the books. Green running shorts and a

green and white shirt were found in Brown's work locker, and undershorts found in the locker had semen stains. *Id.* at 523-24. At trial, three witnesses positively identified Brown as the man they saw near the grove on the day of Susan's death. *Id.* at 524.

Brown presented an alibi defense. His mother testified that Brown was at home with her on the morning of October 28, leaving the house for only about eight minutes to get milk, and then leaving for work at 8:14 a.m. *Id.* at 525.

The jury convicted Brown of first degree murder and of the special circumstance of murder in the course of rape. At the penalty phase, the prosecution presented evidence that Brown had previously raped a fourteen-year-old girl in her home as she prepared to leave for school. *Id.* at 525. The defense presented psychiatric and background evidence suggesting that Brown suffered severe emotional problems, including sexual maladjustment and dysfunction. *Id.* at 525. Brown's defense psychiatrist opined that Brown killed Susan out of shame for raping her, and that the phone calls indicated shame and a desire to be caught. The psychiatrist opined that Brown was not violent by nature, but was only a threat to women, and that he would not present a problem if sentenced to life in prison.

Several of Brown's family members testified on his behalf. Brown also took the stand, expressed remorse for the prior rape, and asked the jury for mercy. *Id.* at 525. After deliberating for less than three hours, the jury returned a death verdict.

On direct appeal, the California Supreme Court affirmed Brown's conviction, but reversed the penalty based on what it perceived as an improper jury instruction. *Id.* at 537-38. However, the United States Supreme Court granted certiorari and reversed the California Court, thus reinstating the death penalty. *California v. Brown*, 479 U.S. 538, 539-43 (1987). On remand, the California Supreme Court reversed again

because the trial court had failed to make a proper record of its denial of the motion for modification of the death penalty. *People v. Brown*, 45 Cal. 3d 1247, 1263-64 (1988). The trial court then made a proper determination on the record, which was upheld by the California Supreme Court, and the United States Supreme Court denied Brown's petition for certiorari. *People v. Brown*, 6 Cal. 4th 322 (1993).

Brown filed his federal habeas petition in May 1996, but it contained many unexhausted claims. The district court stayed proceedings, and Brown filed a habeas petition with the California Supreme Court in November 1996, which was cursorily denied (on procedural grounds and on the merits) in an unpublished opinion on June 3, 1999. Brown then filed a second amended habeas petition in district court in August 1999. The district court held an evidentiary hearing on two of Brown's claims involving penalty phase ineffective assistance of counsel and then denied relief on all grounds.

The district court granted a COA on two ineffective assistance of counsel issues—Claim 20, subparts (B) and (C)—and denied Brown's motion to expand the certificate. In an order filed May 15, 2007, we expanded the COA to include Brown's Claim 20(A) (an additional claim of ineffective assistance) and Claim 38 (a claim that lethal injection violates the Eighth Amendment).

## STANDARD OF REVIEW

The district court's dismissal of the petition for a writ of habeas corpus is reviewed *de novo*. *Avila v. Galaza*, 297 F.3d 911, 914 n.1 (9th Cir. 2002). The district court's findings of fact are reviewed for clear error. *Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir. 2005).

Because Brown's federal habeas petition was filed after April 1, 1996, his action is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under

AEDPA, we defer to the last reasoned judgment by the state courts and grant habeas relief only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). To grant relief, we must determine that the state court decision was " 'not only erroneous, but objectively unreasonable.' " *Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam)).

When the state court decides a claim on the merits, but does not provide the reasoning for its decision, we undertake an independent review of the record before that state court to determine whether the state court decision was objectively unreasonable. *See Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review "is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The state court decision is reviewed under the clearly established law at the time of the state court decision. *Stokes v. Schriro*, 465 F.3d 397, 401-02 (9th Cir. 2006). Clearly established federal law as determined by the Supreme Court includes only " 'the holdings, as opposed to dicta, of [the Supreme] Court's decisions.' " *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

## DISCUSSION

### I.  Penalty Phase Ineffective Assistance of Counsel[1]

---

[1]The state argues that in evaluating this claim, this court should not consider any of the evidence adduced at the district court's evidentiary hear-

### A. Legal Standard

In addition to the deference granted to the state court's decision under AEDPA, we review ineffective assistance of counsel claims in the deferential light of *Strickland v. Washington*, 466 U.S. 668 (1984). We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. To succeed on his claim, Brown must establish that his counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 687, 694.

### B. Claim 20(A)

Brown alleges his counsel was ineffective for failing adequately to prepare his mental health expert, Dr. Summerour, to testify. Brown contends that because Dr. Summerour had developed negative information about Brown that could be exposed during cross-examination, his counsel, Mr. Myers, should not have called Dr. Summerour to testify at all.

The bulk of the information to which Brown objects came from a life history that Dr. Summerour asked Brown to prepare to aid in understanding his psychological makeup. In the life history, Brown described his thoughts during the prior rape of Kelly Porterfield. Brown related such thoughts as "why should I let this grand opportunity go to waste" when

---

ing, unless this court first determines that the California Supreme Court's decision was an unreasonable application of clearly established federal law, as determined by the Supreme Court. We need not address this issue because we conclude that even considering the additional information presented in district court, Brown's claim still fails.

he encountered Kelly in the home and "what the hell" when deciding whether to ejaculate inside her. Brown's history also described the rape itself, indicating that "[w]hen I got ready to ejaculate, her body motions changed and she was like giving in," and "I asked her to put her leg around me and she did."

The relevant question is therefore whether reasonable counsel, knowing the risk that this information would be brought to light, would still call Dr. Summerour to testify. Although Myers was clearly risking exposing this negative information to the jury, the jury already knew about the Porterfield rape from Kelly's testimony. Myers needed at least to attempt to offer some explanation to the jury for both the Susan Jordan rape/murder and the prior rape of Kelly Porterfield.

In the penalty phase, the government pointed out that Brown had not murdered Kelly Porterfield and had wound up going to prison for that rape. The prosecutor suggested that Brown learned from this mistake and murdered Susan Jordan so there would be no witnesses to his crime. Dr. Summerour provided some potentially beneficial information to dispel this suggestion. Dr. Summerour concluded that Brown did not have a sense of what is normal in the way of sexual attraction and behavior, and that Brown's problems may be partially attributable to his mother, who had both physically and emotionally abused him. Dr. Summerour indicated Brown had complained his mother had spanked him so severely he could not wear shorts to gym class. Dr. Summerour also testified that Brown's mother had told Brown that sex was dirty and that he was not supposed to do "dirty things" with girls or his fingers would fall off and one of his legs would get shorter. Brown apparently had an uncle with some missing fingers and believed this was what had happened to him.

Dr. Summerour explained that Brown suffered from severe sexual dysfunction and was not able to have normal sexual relations, being able to complete the act only if either he or

the other person were completely in control. Dr. Summerour also testified that Brown was basically in a state of arrested development sexually, putting him roughly in an adolescent stage, and that this probably explained his interest in young girls.

Dr. Summerour also opined that Brown was not "antisocial" or "sociopathic," but actually could feel shame and remorse for his actions, and that Brown did hold to some of society's values, such as working and education. Dr. Summerour indicated that Brown's feelings of shame were the reason why Brown could not confront his victims. For example, in the Kelly Porterfield rape trial, Brown had initially pled not guilty, but when the time came for Kelly to testify, Brown could not face her and pled guilty. Similarly, in the penalty phase of this case, Brown refused to be present in the courtroom when Kelly testified, and when Brown himself was called to testify, he expressed regret that Kelly had suffered. Dr. Summerour opined that Brown had killed Susan Jordan out of shame for his actions and that Brown had left her face down in the dirt so that he did not have to face her.

In addition, Dr. Summerour opined that Brown was suffering from a narcissistic personality disorder. Dr. Summerour explained that this was an exaggerated self-love, which was usually a compensation for feelings of inadequacy (in Brown's case, sexual impotency). He indicated that narcissistic people often have a rich fantasy life and, in Brown's case, Brown imagined that he could somehow make things right with Kelly Porterfield, make her fall in love with him, and even marry him. Dr. Summerour explained that this disorder may also have been why he made the phone calls on the evening of the murder — i.e., to get noticed and to be caught. Dr. Summerour further testified that Brown had not received any treatment for his sexual disorders while in prison for the Porterfield rape.

[1] Although the picture painted by Dr. Summerour is not a pretty one, it is significantly more sympathetic than the one

portrayed by the government. Faced with horrific crimes against teenage girls, it was not unreasonable for Myers to conclude that some explanation that presented Brown as a troubled individual, rather than a ruthless killer seeking to avoid capture and compound the victim's family's pain, might give Brown some hope for a life sentence.

**[2]** Myers himself testifies that he would do things differently if given a chance today but that, at the time, he believed Dr. Summerour was capable, had a beneficial opinion about Brown, and that perhaps his analysis would help the jury "see Mr. Brown as human and might result in their showing some mercy." We do not judge counsel's actions through the twenty-twenty lens of hindsight, *Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007) (en banc), and recognize there are many different reasonable ways to try a case, *id.* at 1128. Although Myers's decision to put Dr. Summerour on the stand came with some risks, it came with benefits to Brown as well, in an attempt to explain the genesis of his behavior and portray him as more human and sympathetic to the jury. These benefits were available only if Dr. Summerour were called. We therefore agree with the district court that Myers's decision to have Dr. Summerour testify "might be considered sound trial strategy," *Strickland*, 466 U.S. at 689, as a reasonable attorney could conclude that the positive outweighed the negative:

> As the Court has previously ruled, counsel made a reasonable strategic decision to present Dr. Summerour's opinions to the jury despite the baggage involved. Summerour's testimony was a major part of the presentation in mitigation, portraying Petitioner as an inhibited, sad figure with a fear of women rather than as a vicious predator. The choice to depict him as an ill man, at the mercy of his complexes, was a reasonable strategic choice to try to earn him sympathy and mercy.

As such, we cannot say that it was objectively unreasonable for the California Supreme Court to conclude Brown had not satisfied the requirements of *Strickland*. We therefore affirm the district court's denial of Claim 20(A).

## C.   Claims 20(B) & (C)

Brown's other ineffective assistance claims are so intertwined that they are best discussed together. Brown contends that Myers was ineffective in the penalty phase because he failed to conduct an adequate background investigation and because, if this additional information had been presented to a competently trained neuropsychologist (as opposed to a psychiatrist), such an expert could have presented a more compelling case to the jury.

### 1.   *Adequacy of Investigation*

[3] "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999). In numerous cases, this court and the Supreme Court have explained and reiterated this high standard for investigation in capital cases. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003); *Williams*, 529 U.S. at 397; *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004); *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999).

Brown contends that Myers fell below this standard because he failed to conduct an adequate background investigation for the penalty phase. Myers interviewed Brown and numerous family members about Brown's childhood, but did not specifically ask any of them about physical abuse. Myers also did not obtain any of Brown's military records, although Brown indicated (and testified at the penalty phase) that he had been disciplined for impersonating an officer. In addition, Myers did not obtain any of Brown's high school or college records, relying on his impression that Brown was of normal

literacy based on his ability to communicate, as well as the life history Brown wrote for Dr. Summerour.

Brown argues that a more complete investigation would have revealed that, while living with his great aunt for a year or so around third grade, he (and his siblings) were beaten with a broom handle. Brown's military records reveal that he was disciplined for being absent without leave ("AWOL"), but do not indicate he had impersonated an officer. Brown's school transcripts reveal that he was doing rather poorly in high school and that, although he had enrolled in a local community college, he had never completed a course. We consider each of Brown's allegations of deficiency in turn and in relation to their potential impact on the sentencing proceeding.

### 2. *Additional Abuse by Aunt*

**[4]** Even assuming Brown is correct that his counsel was ineffective in failing to investigate childhood abuse, Brown does not explain how the additional information about abuse by his aunt could have altered the outcome of his penalty phase hearing. To support his claim, he offers only his own declaration that his aunt "used to beat me and all of the kids with a broom handle. She was vicious." Brown provides no specifics as to the severity, duration, or frequency of these beatings, nor does he offer the testimony of any family member to corroborate his allegation.

Although childhood abuse can certainly constitute a mitigating factor, the jury in this case had already heard through Dr. Summerour that Brown claimed he had been severely spanked by his mother as a child — to the point of not being able to expose his legs in gym class — and how her comments to him about sex may have negatively impacted his sexual development and resulted in his sexual dysfunction. When asked about the alleged additional abuse by the aunt in a deposition, Dr. Summerour explained that this was some-

thing he would have probably told the jury about, to additionally explain the etiology of Brown's behaviors and problems, but that the information would not have altered his basic diagnosis.

The state, on the other hand, had evidence that Brown had recently raped another young girl [Kelly Porterfield] and had also been involved in a voyeuristic sexual incident with a 12-year-old girl before that. The rape and murder of Susan Jordan was bad enough by itself, but it was also coupled with taunting phone calls to torment her family. The jury deliberated less than three hours before reaching a death verdict.

**[5]** At best, the additional information about childhood abuse would have probably bolstered Summerour's diagnosis, but in light of the other information before the jury, there is no reasonable probability that this information — particularly in the vague manner presented by Brown — could have resulted in a different outcome of the penalty phase of the trial.

### 3. *Military Records*

**[6]** Brown also argues that he was prejudiced by Myers's failure to obtain his military records because the jury was wrongly informed (by Brown) that he was disciplined for a more severe offense than a simple AWOL. Even assuming Myers was deficient in failing to verify Brown's account, Brown again cannot demonstrate prejudice. Brown's explanation at trial was that he impersonated an officer as a joke on new recruits and that others played along with it. Thus, the impersonation was not portrayed to be a "severe" offense to the jury. Moreover, in light of Brown's serious crimes that were the true focus of the penalty phase, there is no reasonable probability of a different outcome if the jury had known

that Brown was only disciplined for being AWOL instead of for impersonating an officer.[2]

### 4. *School Records*

Brown's final claim is that his counsel should have obtained his school records, which would have revealed poor performance and, in turn, identified the need for psychological testing, which would have revealed that Brown suffered from dyslexia and attention deficit disorder ("ADD"). As explained by Brown's new expert, Dr. Stotland, in his declaration and at the evidentiary hearing, Brown's attention deficit affects his learning, behavior, and decision-making, making him impulsive. Dr. Stotland opines that Brown responds to "stressful or complicated circumstances by repeating or escalating his behavioral pattern even when his actions are inappropriate or harmful," and that Brown has "severe difficulty inhibiting inappropriate behavior."

In his deposition, Dr. Summerour — Brown's trial expert — explained that he did not pick up on Brown's condition based on his meetings with Brown or his review of Brown's life history, but that learning problems or other problems in the classroom might have alerted him to the possibility of ADD. He also agreed that ADD could have contributed to impulse control problems and heightened frustration. Dr. Summerour also testified that if he had known Brown suffered from learning disabilities or ADD, he would have disclosed this to the jury, even though it would not have altered his ultimate conclusions or diagnosis.

[7] Brown therefore has a good argument that his counsel's performance was deficient by failing adequately to investigate Brown's academic background and provide this relevant

---

[2]Curiously, even at the federal court evidentiary hearing, Brown continued to assert that he had been disciplined for impersonating an officer, notwithstanding the now-present military records.

information to Dr. Summerour. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000); *Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001); *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002). Once again, however, the question of prejudice looms: was there a reasonable probability of a different outcome if Brown's school records had been available at the time of the penalty phase?

**[8]** It is not clear whether, even if Myers had obtained the school records and provided them to Dr. Summerour (or any other mental health expert), Brown would have actually been diagnosed with ADD. Dr. Summerour testified that at the time of Brown's trial in the early 1980's, ADD was considered a childhood disorder that was outgrown by adulthood. Thus, although Dr. Summerour testified he could have probably identified ADD today using current tests, in the early 1980's, the diagnosis "depended more upon observation of behavior problems in children." Dr. Stotland's diagnosis of Brown in 1996-97 may be correct, but this does not mean that counsel's failure to obtain the academic records in 1981-82 actually hindered the penalty phase mitigation presentation.

Even if Brown's ADD could have been diagnosed in the early 1980's, there was little additional benefit to be gained from Dr. Stotland's testimony. In large part, both Dr. Summerour and Dr. Stotland agreed that Brown had severe sexual dysfunction that had stemmed from negative interactions with his own mother and other women, and this was probably the most explanatory or sympathetic evidence that could be put before the jury. Dr. Stotland described Brown as having "obsessive-compulsive" behavior, but also agreed that Dr. Summerour's diagnosis of narcissistic personality disorder was not unreasonable and that Brown definitely had a problem with narcissistic personality traits. Dr. Summerour also testified during the penalty phase that Brown was immature

and had impulse control problems, which was consistent with Dr. Stotland's later observations.[3]

Even if Dr. Stotland could have, as Brown claims, presented a more "cohesive" explanation of Brown's problems to the jury, Brown had a mountain of aggravation to overcome, including the prior rape of a young girl, the rape and murder of the young victim in this case, and his tormenting phone calls to the family following the event. The jury was also aware from Brown's own testimony that Brown professed remorse over the prior rape of Kelly Porterfield, but remained strangely silent as to Susan Jordan's rape or murder.

[9] To be sure, horrific facts do not preclude a finding of prejudice. *See, e.g.*, *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999); *Mak v. Bodgett*, 970 F.2d 614, 620-21 (9th Cir. 1992). But giving the state court decision the deference it is due under AEDPA, we cannot say that the California Supreme Court was objectively unreasonable in concluding that Brown had not satisfied both prongs of *Strickland*. Dyslexia and ADD — assuming they could have even been diagnosed in adults in the early 1980's — are somewhat common disorders; although they add quantity to the mitigation case, they add little in terms of quality. It is doubtful that this information, even when explained by Dr. Stotland, would have generated significantly more sympathy than the explanation

---

[3]Indeed, we note that it is possible that Dr. Stotland — armed with all the information Brown says should have been discovered — could have actually been a more damaging witness than Dr. Summerour. Dr. Stotland admitted during the evidentiary hearing that Brown definitely had antisocial traits and that the telephone calls to Susan's family after the murder were consistent with an antisocial desire to torture someone, whereas Dr. Summerour consistently testified that Brown was *not* antisocial or sociopathic. Dr. Stotland seemed to opine that the murder occurred as a result of escalating, inappropriate reactions to the complicated sexual situation Brown was involved in, and that Brown may have had anger against women. Dr. Summerour, on the other hand, testified that Brown was motivated by sexual urges rather than violence toward women, and explained the murder as a consequence of shame.

of Brown's neurosis that was already given by Dr. Summerour,[4] or, for that matter, that either of these explanations was going to overcome the substantial aggravating case. We therefore affirm the district court's denial of the writ on this claim.

## II.    Cruel and Unusual Punishment

Brown also argues that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment. He alleges in his habeas petition that "lethal injection violates the ban on cruel and unusual punishment because it does not comport with evolving standards of decency, and it inflicts pain that is cruel, wanton, and unnecessary."

Brown raised this general challenge to lethal injection before the California Supreme Court in his habeas petition, and it was denied on the merits. In district court, Brown adduced no evidence to further this claim and opted not to brief the issue, essentially conceding it was foreclosed based on "the current state of the law and record in the case."

[10] On appeal, however, Brown attempts to rely on two recent California district court decisions holding that the current lethal injection protocol utilized by California violates the Eighth Amendment: *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006) and *Morales v. Hickman*, 415 F. Supp. 2d 1037 (N.D. Cal. 2006). These cases are actually § 1983 cases, and do not hold that lethal injection is cruel and unusual in and of itself (as Brown's petition alleges), but only that the protocol as currently implemented in California may violate the Eighth Amendment because the state does not have proce-

---

[4]In his deposition, Dr. Summerour opined: "[I]n this case, I felt what was important was that the man had evidence of shame and guilt and that he hadn't had the benefit of much treatment. And that was mitigating and that was sympathetic. I think that's much more sympathetic in my opinion than saying he has a learning disorder and has attention deficit disorder. That's just my opinion."

dures in place to insure that inmates are unconscious (from an initial and rather painless injection of sodium thiopental) prior to injecting fatal doses of pancuronium bromide and potassium chloride.

[11] Under AEDPA, however, we must analyze the California court's conclusion in light of the clearly established federal law at the time of the state court decision. *Stokes v. Schriro*, 465 F.3d 397, 401-02 (9th Cir. 2006). There is no Supreme Court precedent holding lethal injection to be unconstitutional, and there certainly was none in existence at the time of the California Supreme Court's denial of Brown's claim in 1999. Because on this record Brown cannot demonstrate that the California Supreme Court's denial was an objectively unreasonable application of clearly established Supreme Court precedent, we affirm the district court's denial of the writ on this claim.[5]

## III. Uncertified Issues

### A. Standard of Review

After the district court issued the COA as to Claims 20(B) and (C), Brown asked this court to expand the COA to include several additional claims. A motions panel denied this request, but indicated Brown could brief these issues to the merits panel, which he has done. We construe this additional briefing as a further motion to expand the COA. Circuit Rule 22-1(e). To receive a COA on any of these issues, Brown must demonstrate that "reasonable jurists would find the dis-

---

[5]We do not view Brown's habeas petition as stating an "as applied" challenge to California's lethal injection protocol. Brown is free, however, to challenge the particular protocol used by the State of California in a § 1983 action, as did the petitioner in *Morales*, and need not raise this issue in habeas proceedings for fear of waiver. *See Hill v. McDonough*, 126 S. Ct. 2096, 2102 (2006) (holding "as applied" challenge to a particular lethal injection protocol can be brought as a § 1983 action and is not barred as a second or successive habeas petition).

trict court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## B. Jurors Overhearing Comments Regarding Case

Brown claims he was deprived of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because the state trial court failed to declare a mistrial after four jurors overheard comments regarding the case. It appears that during the guilt phase of the trial, four jurors went to lunch together at a local fast food restaurant. After they sat down, another group sat down near them, which may have included some members of Brown's family and/or friends. This second group was talking very loudly and made comments about the case the jurors could overhear. The four jurors finished their lunch as quickly as possible and did not discuss the case amongst themselves. They returned to the courtroom and informed the judge what had happened.

The judge communicated ex parte with the four jurors, and there is no transcript of what occurred. He did, however, have the jurors make "little reports" about what happened, which were handwritten notes stapled to the minute order for February 1, 1982. These notes tell the same basic story — the group went to eat, the second group sat down and was talking noisily about the case, so the jurors decided to ignore them and finish lunch as quickly as possible. Only one note appears to describe the subject matter the other group was discussing — "were witnesses expert or not, did kids [sic] testimony count, etc."

Following the incident, the court admonished the entire jury on the record:

> [I]t has come to my attention that from time to time you might be placed in a position where there is somebody in the vicinity talking about the case and you can correctly ignore it and, of course, if you can,

> to avoid hearing anything that you can and if you can, simply do your best to ignore it and try to treat it as though you never heard anything. Put it out of your mind. Stay with just what is received here in court.

After the jury was dismissed for the day, the court informed trial counsel what had occurred and made the notes available for them to review:

> There are some statements here from some of the jurors and I think probably the best thing to do is make them available for counsel at their convenience. Some of the jurors heard some others talking regarding the case and they ignored it and I have [sic] them make a little report and so I will make that available for counsel at your convenience . . . .

The record does not indicate that either counsel asked to examine the jurors in more detail.

Brown now argues that the trial court erred by failing to declare a mistrial sua sponte. Although a more developed record would certainly make appellate review easier, the evidence that was submitted about the incident in the form of the "little reports" suggests that the encounter was relatively brief and that the jurors did their best to ignore the comments and minimize their exposure.

[12] The California Supreme Court was not objectively unreasonable in denying Brown's claim on the merits, because Brown has not demonstrated that the alleged error had a "substantial and injurious effect on the verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The jurors promptly reported the incident to the trial judge and did not discuss any comments they may have overheard among themselves. The trial court properly instructed the jury to disregard any extraneous comments and to decide the case based only

on the evidence at trial; juries are presumed to follow the court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Furthermore, considering the eye-witness testimony and the extensive evidence found at Brown's home and work locker linking him to the crime, the guilt phase evidence against Brown was overwhelming. Because the district court's assessment of this constitutional claim was neither wrong nor debatable, we deny the COA on this claim.

### C.  Other Claims[6]

**[13]** In his 39th Claim for relief, Brown argues that the death penalty is unconstitutionally arbitrary and that a defendant's socio-economic background influences who is sentenced to death. In his 40th Claim for relief, he argues that the death penalty is inherently unconstitutional because the consistency required by *Furman v. Georgia*, 408 U.S. 238 (1972), and the individual analysis required by *Lockett v. Ohio*, 438 U.S. 586 (1978), are irreconcilable. He concedes, however, that there is no valid legal basis for either claim under existing law. We therefore deny the COA on these claims as well because, by his own admission, Brown cannot demonstrate any clearly established Supreme Court precedent that was misapplied by the California state court in denying his petition.

**AFFIRMED.**

---

[6]At oral argument, Brown withdrew his request for a COA on Claim 35 — improper excusal of conscientious jurors — in light of the Supreme Court's recent decision in *Uttecht v. Brown*, 127 S. Ct. 2218 (2007).