**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD LYNN BIBLE,
            *Petitioner-Appellant,*

v.

CHARLES L. RYAN, Director of the
Arizona Department of
Corrections,*
            *Respondent-Appellee.*

No. 07-99017

D.C. No.
CV-98-01859-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
March 26, 2009—San Francisco, California

Filed July 1, 2009

Before: Ronald M. Gould, Richard R. Clifton, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Gould

---

*Charles L. Ryan is substituted for his predecessor Dora B. Schriro as Director of the Arizona Department of Corrections. Fed. R. App. P. 43(c)(2).

8167

## COUNSEL

Daniel D. Maynard (argued), Maynard Cronin Erickson Curran & Sparks, PLC, Phoenix, Arizona, for petitioner-appellant, Richard Lynn Bible.

Terry Goddard, Kent Cattani, Robert J. Gorman, J.D. Nielsen, Jeffrey A. Zick (argued), Office of the Attorney General for Arizona, Phoenix, Arizona, for respondent-appellee, Charles L. Ryan.

## **OPINION**

GOULD, Circuit Judge:

On April 12, 1990, Appellant Richard Lynn Bible ("Bible") was convicted of first-degree murder, kidnapping, and molestation of a nine-year-old girl. He received a death sentence. Bible now appeals the denial of his petition for writ of habeas corpus by the United States District Court for the District of Arizona. He asserts claims of constitutional error in both the guilt and the penalty phases of his trial. The district court issued a certificate of appealability on his claim of ineffective assistance of counsel at the sentencing stage of his trial.

Having carefully and independently evaluated the mitigating evidence and the aggravating evidence, we conclude that Bible was not prejudiced by any of his counsel's alleged errors during the sentencing phase of his trial. There is no reasonable probability that the sentencer would have reached a different result in the absence of the alleged errors. We affirm the district court's denial of habeas relief.

## I

### A

On June 6, 1988, around 10:30 a.m., the nine-year-old victim, Jennifer Wilson, began riding her bicycle to a ranch a

mile away from where her family was staying in Flagstaff, Arizona. Her family passed her while driving to the ranch, but Jennifer never arrived. The family began to look for her and discovered her bicycle by the side of the road. Within an hour of her disappearance, Jennifer's mother called the Flagstaff police to report her daughter missing. The Flagstaff police arrived and immediately called in a helicopter, set up road-blocks, and alerted the Federal Bureau of Investigation that Jennifer was missing. A massive police search ensued. But it was not successful.

Jennifer's mother told police that she saw a man driving a royal blue Blazer-type vehicle at a high rate of speed around the time her daughter went missing. Later that day, Bible arrived at his brother's home near Sheep Hill driving a dark green or silver Blazer-type vehicle. Believing that Bible had been stealing from him, Bible's brother called the police and described the vehicle. The detective who took Jennifer's mother's statement realized that her description of the "Blazer-type" vehicle and its driver substantially matched Bible and the vehicle described by Bible's brother. Police next discovered that Bible had stolen a GMC Jimmy from a police impound lot near Sheep Hill the day before. Later that evening, police saw Bible driving the stolen GMC vehicle. When police tried to stop Bible, a high-speed chase ensued. The police pursued Bible until he rammed the GMC vehicle into a cattle guard, ran from the vehicle, and hid in the woods. Police located Bible using a tracking dog. He was hiding under a ledge covered in twigs, leaves, and branches. Police confiscated a knife on Bible's person and a large folding knife where Bible was hiding. Within hours of his arrest and on the same day that Jennifer disappeared, Bible confessed to steal-ing the GMC vehicle. Police held Bible without bail and con-fiscated his clothing.

In the stolen GMC, which had been used to deliver newspa-pers, police found a blanket, numerous round rubber bands but no rubber band bags, a piece of metal from the steering

column that had been cut open, a case of twenty 50-milliliter bottles of "Suntory" vodka with two bottles missing, some packets of Carnation "Rich" hot chocolate, a wrapped cigar broken in two places, and a "Dutchmaster" cigar wrapper and band in the ashtray. There was blood smeared inside and under the vehicle, but testing did not reveal whether it was human blood.

For almost three weeks, Jennifer remained missing despite the massive yet fruitless search effort. Finally, hikers happened upon Jennifer's body on the top of Sheep Hill, not far from where she had been last seen. Jennifer's naked body was hidden under branches and debris near a tree, with her hands bound behind her back with a shoelace. Police secured the area and processed the evidence found in the vicinity of Jennifer's body. One of her sneakers was found without a shoelace near her body, and her panties were found in a nearby tree. The victim's head and genital area were severely decomposed, and she had multiple skull fractures and a broken jawbone indicating that blows to her head caused her death.

Around Jennifer's body lay distinctive items: an unwrapped, unsmoked cigar with two distinctive breaks in the same pattern as the cigar found in the GMC; an empty ten-pack box of Carnation "Rich" hot chocolate; two empty 50-milliliter "Suntory" vodka bottles; and a piece of metal that perfectly fit the GMC's damaged steering column. Round rubber bands, identical to those found in the GMC, were everywhere—on a path near Jennifer's body, on and under her body, in the tree where her panties were found, near her other clothing, in the leaves covering her body, in the tree above her body, under a tree where one of her shoes was found, and in a rubber band bag sitting five feet from her body.

Near Jennifer's body, there were several clusters of long golden brown hair that were similar to her hair. Many of the hairs were cut on one side and torn on the other. The investigator was able to duplicate this pattern by using the knives

found on Bible when he was arrested, as well as other knives. Mixed among the hair was a pubic-type hair that was similar to Bible's pubic hair samples. Hair similar to Bible's hair was also found on a sheet used to wrap Jennifer's body and on her t-shirt. The police found fibers on top of Sheep Hill that were similar to the GMC seat covers and the blanket found in the GMC. In addition, fibers found in a lock of hair near Jennifer's body were similar to fibers from Bible's jacket. A blue or purple fiber on the shoelace binding Jennifer's hands also matched the lining of Bible's jacket.

Several hairs on Bible's clothing were similar to Jennifer's hair and were also cut on one side and torn on the other. Police determined that hair found in the GMC was similar to Jennifer's hair. Blood on Bible's shirt matched Jennifer's PGM 2+ subtype—a subtype shared by less than three percent of the population. Bible has a PGM 1+ so the blood could not have been his subtype.

**B**

While still in jail for stealing the GMC, Bible was charged with first-degree murder, kidnapping, and child molestation. After a six-week trial, the jury found Bible guilty on April 12, 1990, of all charges. After the jury returned the verdict, Bible's lead attorney, Francis Koopman ("Koopman"), moved for a pre-sentence psychological evaluation requesting Dr. Otto Bendheim be appointed for this purpose and a sentencing hearing date be set for at least sixty days later. The prosecutor did not oppose Dr. Bendheim's appointment, but asked that Dr. Jeffrey Harrison be appointed as well. The court appointed both doctors to perform a mental evaluation and directed them to evaluate Bible's mental condition at the time he committed the offenses and discuss the relation of any mental disease or defect to the offense. The court also sought the doctors' opinions on Bible's potential for rehabilitation and his feelings of remorse. After defense counsel stipulated

to the sixty-day deadline, the judge scheduled the sentencing hearing for June 12, 1990.

Dr. Bendheim filed his report after interviewing Bible on three occasions and after reviewing "thousands of pages of [ ] material concerning [Bible's] background and present prosecution." Dr. Bendheim's findings supported the mitigating evidence advanced by the defense: As Dr. Bendheim saw it, Bible's ability to conform his conduct to the law was substantially impaired by alcohol and drug use. During the interviews, Bible had told Dr. Bendheim that he had been a heavy user of drugs until four days before the crime and that he had experienced serious withdrawal when he could not obtain drugs for those days. Although Dr. Bendheim did not determine that Bible was legally insane, he opined that Bible suffered from some diminished capacity at the time of the offenses, "with not only curtailment of proper judgment but also perhaps an inability to resist impulses" due to prolonged drug and alcohol abuse. Dr. Bendheim went on to suggest that "[i]n the absence of serious and prolonged voluntary consumption of very dangerous drugs and alcohol and in the absence of the withdrawal symptom-atology . . . these offenses, more than likely would not have taken place." And because of Bible's addiction and the resulting withdrawal symptoms, "his general personality and character traits, made it more difficult for [him] to live within the requirements of the law."

Dr. Harrison opined that Bible had no "mental illness or mental disorder requiring treatment" but does have "a very serious characterological disturbance in the form of Antisocial Personality Disorder." He noted that "Bible displays an absence of anger, depression and anxiety" and that "the most likely explanation for his violent tendencies is his drug addiction." He concluded that Bible "clearly understood the wrongfulness of the action at the time of the crime."

Bible's second chair defense attorney Lee Brooke Phillips ("Phillips") took the lead on Bible's mitigation case. The

defense filed its sentencing memorandum on June 7, 1990. The defense argued, basing its contentions on Dr. Bendheim's report, that Bible's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired within the meaning of an express statutory mitigating factor set forth in Ariz. Rev. Stat. § 13-703(G)(1). The defense also argued that there were non-statutory mitigating factors such as a difficult family history and a low risk of future criminal conduct (because he would spend the rest of his life in prison). The defense in the sentencing memorandum also argued that any lack of remorseful feelings could not be used against Bible because he had chosen not to admit guilt. Finally, defense counsel included a plea for mercy.

The next day, Phillips filed a motion to continue the mitigation aspect of the sentencing hearing. Phillips stated that he was prepared to proceed on June 12 as scheduled "so that the aggravation part of the hearing can go forward" but needed additional time for the mitigation phase because of Dr. Bendheim's report, which established "strong evidence of mental impairment or diminished capacity as a result of severe drug and alcohol addiction." In addition, counsel stated that they had just discovered that Bible "suffered significant health problems as a child which could be the basis for his current mental condition." In support of the motion, Mrs. Bible, Bible's mother, gave an affidavit reciting that Bible had a difficult birth and was a sickly child, and that she had not provided Bible's medical records to defense counsel earlier because she "did not realize that these were the types of medical problems that [the defense] would be interested in." Defense counsel also moved for the appointment of additional experts, specifically a psychiatrist, neuropsychiatrist or neurologist, and a toxicologist. During the hearing on the motion, Phillips clarified that he only wished to continue the expert witness testimony for one week because Dr. Bendheim was unavailable,[1] but he was able to proceed with the aggravation

---

[1]Dr. Bendheim later became available and testified at the hearing.

aspect and could present a majority of the mitigation witnesses. Further, the defense team explained that they had met with Bible three separate times for two hours each and had "gone over his complete medical history" but Bible said he was never hospitalized and "never had medical type problems that [counsel] were concerned about."[2] Mrs. Bible was interviewed after Bible's conviction, but it was only in preparation for the sentencing hearing, when Mrs. Bible was asked again about her son's medical history, that she mentioned his early childhood illnesses. The court denied the motion to continue and the motion for the appointment of additional experts, stating that Bible "has failed to use due diligence in preparing for the sentencing hearing."

The sentencing hearing proceeded on June 12, 1990. The defense presented extensive mitigation testimony by calling thirteen witnesses during the three-day hearing. Bible's family and friends testified that Bible had a close relationship to his family, that no abuse occurred during his childhood, and that he was an affectionate youth.[3] Mrs. Bible testified that she and Bible's father raised him, and he was the second of four children. Mrs. Bible testified that, following a difficult delivery, Bible's lungs were so full of fluid that he was given an "exceptional amount of oxygen." She said that Bible was continually ill as a child with fevers and allergies, and was hospitalized for bronchitis or pneumonia. Further, she testified that Bible was a hyperactive child, and doctors prescribed amphetamines to control him. Mrs. Bible also stated that Bible complained of ringing in his ears and headaches but she never took him to a neurologist and he never underwent a CT scan.

---

[2] Bible was only an infant or toddler when he was allegedly hospitalized.

[3] Bible's father, mother, sisters, brother, grandmother, ex-girlfriends, defense investigator, and friends, among others, testified on his behalf at the hearing.

Mrs. Bible testified that Bible kept in touch with her when he went to prison in 1981 for his previous sexual assault and kidnapping convictions, and that he wrote her letters expressing his love for her and his family. After Bible was released from prison in 1987, he sought counseling but stopped the sessions for financial reasons. He also dated Josephine Sandoval for about a year. Sandoval testified that they had a normal relationship and Bible cared for and loved her young son. Sandoval then described Bible's avid drug use, stating that he snorted cocaine and methamphetamines and may have used drugs intravenously (though she was never a witness to it). She also stated that when Bible used drugs, he was unpredictable, but when he was not using drugs, he was a "pretty nice" guy.

Bible's father stated that he frequently took his sons hunting and fishing, that Bible had enjoyed those activities, and that Bible never exhibited violence or aggression, nor was he cruel to animals. Bible's brother echoed this testimony. Bible's father also testified that Bible loved his nieces and had never lost his temper with them. Bible's father opined that if Bible had committed the crimes charged, the only explanation was drug use.

Bible's younger sister also testified. She stated that she and Bible had been close and Bible had been protective of her. She said that Bible was appropriate with her children, that he liked children, and that he was a caring person. Several of Bible's friends also testified that Bible was sweet, caring, and appropriate with children. Bible's sister also described Bible's drug use. According to her, before Bible went to prison for the 1981 sexual assault and kidnapping, Bible used drugs on weekends, but after his release he used drugs more heavily. Shortly before his arrest, Bible had told her he thought that he was having a nervous breakdown.

The defense investigator, Vanessa Lawson, testified that she had found Bible socially appropriate, pleasant, coopera-

tive, and honest. He was remorseful toward the Wilson family and frightened about his future. She also testified that Bible had foiled an escape attempt while in jail because he feared for the safety of a prison guard.

Dr. Bendheim, the defense expert, also testified. He said that Bible "conducted himself very well" during his interviews and was "polite, courteous, [and] cooperative." He also testified that (1) Bible had come from a good home, but he began using alcohol and drugs in his early teens; (2) he had abused drugs almost daily during the year before the murder; (3) he was suffering from withdrawal at the time of the crime, resulting in a state of diminished capacity; and (4) absent the effects of drugs and alcohol, Bible would not have committed the crimes.

Dr. Bendheim stated that when drugs are used for many months or several years and then withdrawn, "the person suffers a great deal and tries to alleviate his suffering, often by totally inappropriate means, . . . his capacity to conduct himself properly and decently is again diminished in many instances." Dr. Bendheim opined that Bible would have been in a state of diminished capacity during this period of withdrawal. Bible told Dr. Bendheim that he had been heavily using drugs until four days before the crime, and "had serious withdrawal symptoms, sweats, sleeplessness, nervousness, agitation, and during that [time] he tried to find relief by eating sweets, honey, peanut butter, things of that nature." Dr. Bendheim accepted Bible's account as a truthful description of withdrawal symptoms.

Dr. Bendheim then stated that prolonged use of amphetamines and cocaine can result in brain changes, and although not easy to detect, such changes can be detected with certain tools like brain scans or brain wave tests. Dr. Bendheim, however, noted that a number of physicians specialize in withdrawal symptomatology and detoxification who have more experience in the area than himself. He said that additional

tests could determine Bible's mental impairment or the effect that the severe drug use has had on his brain, and that he supported defense counsel's need for additional examinations. Dr. Bendheim stated that he "would suspect the possibility, even probability [of demonstrable brain change], but I can't prove it without" tests.

After defense counsel concluded, the prosecution called one rebuttal witness, Detective Mike Rice, who had interviewed Bible on the day of his arrest on June 6, 1988. Detective Rice stated that Bible did not appear to be impaired during the interview and did not seem to be suffering from withdrawal. According to Detective Rice, Bible did not appear to have the "shakes" or chills, did not complain of headaches, and did not request food, water, or medical help. Bible told Detective Rice that it had been four or five days since he last used drugs.

Phillips's closing argument focused on Bible's drug use and how that could have led to his impairment at the time of the murder. Phillips described Bible's love for his family and urged the court not to be influenced by the public frenzy.

In sentencing Bible, the judge found three aggravating circumstances existed beyond a reasonable doubt:[4] (1) that Bible previously had been convicted of a felony involving the use or threat of violence (the 1981 convictions of sexual assault and kidnapping); (2) that Bible had committed the murder in an especially cruel manner because the victim suffered mentally and physically; and (3) that Bible was an adult and the

---

[4]Arizona law at the time of Bible's trial and sentencing required the judge presiding over the trial to decide whether to impose the death penalty. *See* Ariz. Rev. Stat. § 13-703(B) (1990). While the Supreme Court later struck down Arizona's capital sentencing scheme in *Ring v. Arizona*, 536 U.S. 584 (2002), the holding in *Ring* that aggravating factors must be found by a jury rather than a judge "does not apply retroactively" to cases, like this one, that are "already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

victim was less than fifteen years of age at the time of the offense. The court then considered and rejected the mitigating circumstances regarding Bible's drug use. It found that

> [N]either the defendant's ability to appreciate the wrongfulness of his conduct [n]or to conform his conduct to the requirements of law were substantially impaired. Even the defense experts found that he appreciated the wrongfulness of his conduct. Doctor Bendheim only found that it would be more difficult for the defendant to conform his conduct to the requirements of law, not substantial impairment. This difficulty was due more to his general personality and character than to drugs.
>
> . . .
>
> Even if the defendant had been experiencing a desperate craving for drugs that day, Jennifer Wilson did not stand between him and his drugs, nor did she provide any means for him to obtain drugs. Her killing had nothing to do with drugs.
>
> If the defendant's condition were truly such that he would go into withdrawals so severe that he acted strange when deprived of drugs, then this would have manifested after his imprisonment in the County Jail on June 6. All the evidence is to the contrary: there were no symptoms of withdrawal.
>
> This is not a mitigating circumstance.
>
> [T]he defendant was not intoxicated on June 6, 1988. Only two small bottles of vodka were missing from the carton. If the defendant consumed them, the amount of alcohol they contained would not suffice to make him intoxicated to the point where he would qualify for intoxication as a mitigating circumstance.

> The defendant denies that he was intoxicated on anything else, claiming instead that he was experiencing withdrawals due to drug deprivation for several days. No one who had contact with him on June 6 reported that he acted intoxicated. They said he acted normal.

> This is not a mitigating circumstance.

The trial judge found that Bible did not have a difficult family history and stated that the mutual love between him and his family did not qualify as mitigating. In addition, the trial judge determined that Bible was not remorseful and that he presented a high risk of future criminal conduct. Concluding, the trial court stated that "even looking at the case in the light most favorable to" Bible, there were no mitigating circumstances and no way to cumulate or aggregate them. The trial court then sentenced Bible to death.

## C

Bible appealed his conviction and sentence. The Arizona Supreme Court affirmed the judgment on direct appeal. *State v. Bible*, 858 P.2d 1152 (Ariz. 1993). The Arizona Supreme Court held that the trial court had erred in finding that Bible's prior conviction was an aggravating factor because "neither the use nor the threat of violence was a *necessary* element for" either kidnapping or sexual assault. *Id.* at 1207. Because two aggravating circumstances remained, however, and because the "trial court correctly characterized the lack of mitigating evidence," it affirmed Bible's sentence. *Id.* at 1209, 1212. The Arizona Supreme Court reviewed the record and concluded that "nothing submitted to the trial court qualifies as more than de minimis evidence of mitigation" so there was "simply nothing to weigh or balance." *Id.* at 1212.

The United States Supreme Court rejected Bible's petition for a writ of certiorari. *Bible v. Arizona*, 511 U.S. 1046 (1994) (mem.).

Bible filed a petition for state post-conviction relief ("PCR") on November 29, 1996. In his PCR petition, Bible claimed that he received ineffective assistance of counsel at the penalty phase. He attached several affidavits, including one from a mitigation specialist, Mary Durand, who attested that Bible's mitigation investigation was "totally inadequate" and did not meet the minimal requirements in a capital case because

> No multi-generational or trans-generational family history was done by the defense, no review of birth, school, mental health, medical or employment records was done by the defense, no review of law enforcement, court records or D.O.C. records, and no complete psychological or psychiatric examination was conducted. No mitigation specialist or expert was ever consulted to determine needs.

Bible's defense investigator, Lawson, agreed with Ms. Durand's assessment; the mitigation investigation she conducted was "completely inadequate and fell well below the standard of effective representation." Phillips attested that the sentencing preparation had not begun in 1988 as required by the ABA guidelines for counsel in capital cases; and that he had been unaware of the standards for presentation of mitigation in capital cases. A psychologist, Richard Lanyon, also submitted an affidavit. Though Lanyon did not state that he had ever personally evaluated Bible, he attested that "neuropsychological examination can document the effects of brain damage" and "certain factors indicate that a neuropsychological examination is warranted" such as "a difficult child birth, oxygen deprivation in childhood, one or more high fevers in childhood, headaches in childhood, and inhalation of vapors in childhood." The affidavit did not state, however, that Bible suffered from any brain damage.

The PCR court denied Bible's claim of ineffective assistance of counsel at sentencing on November 24, 1997. It held

that Bible's claim was speculative, stating "[t]here is . . . no credible assertion, supported by affidavit, showing what mitigation evidence might have been discovered, or argument as to how the evidence might have resulted in a different sentence. An evidentiary hearing is not required where Petitioner stops short of revealing what relevant evidence would have been presented."

Bible filed a federal habeas petition in the District of Arizona on October 15, 1998. The district court denied Bible's petition and granted a certificate of appealability on the issue of ineffective assistance of counsel at the penalty stage on July 25, 2007. The district court then denied Bible's motion for reconsideration.

On appeal, having considered the issue of ineffective assistance of counsel at the penalty stage, we reject this claim under the appropriate standard for reviewing the denial of a petition for habeas corpus under 28 U.S.C. § 2254.

## II

We review a district court's denial of a habeas petition de novo. *Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008). Bible filed this petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Thus, we apply AEDPA deference to any state court decision on the merits. *Id.* We must deny a habeas petition unless the state court's adjudication of the claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented before the state courts. 28 U.S.C. § 2254(d). The Supreme Court need not apply a specific legal rule to an identical fact pattern as in the instant case for that rule to qualify as clearly established law. *Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007). And Ninth Circuit precedent may provide persuasive

authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Mejia*, 534 F.3d at 1042.

# III

Bible contends that he received ineffective assistance of counsel at sentencing because his counsel did not diligently pursue mitigation evidence and provided little guidance to the mental health expert. Regardless of any mitigation case deficiencies, given the significant mitigating evidence actually presented, the speculative mitigating evidence counsel failed to introduce is insufficient to outweigh the powerful aggravating circumstances surrounding Jennifer's murder. We conclude that the Arizona court's determination that Bible suffered no prejudice was not unreasonable.

**[1]** To prevail on a claim of ineffective assistance of counsel, Bible must show that (1) his trial counsel's performance "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

Establishing prejudice in the death sentence context requires a showing that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. The defendant " 'bears the highly demanding and heavy burden [of] establishing actual prejudice.' " *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 394 (2000));

*see also Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

**[2]** We conclude that, after considering the mitigating evidence, "both that which was introduced and that which was omitted or understated," *Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001) (en banc), alongside the aggravating evidence, Bible cannot demonstrate that his counsel's performance at sentencing prejudiced him. *See Strickland*, 466 U.S. at 691. This is so because given the aggravating factors related to Jennifer's murder, we cannot say that there is a reasonable probability that the sentence would have been different. The cruelty of the murder, in which Bible stripped and bound his child victim with her own shoelace, could not have been lost on the sentencing judge, and all theories of mitigation were speculative or were patently insufficient to overcome these aggravating factors.

Bible alleges that his attorneys were ineffective because they did not conduct an adequate investigation into Bible's social and medical history. His argument is: if his counsel had investigated further, they would have learned that Bible had suffered from high fevers and other illnesses as a small child, and they could have relayed this information to Dr. Bendheim and others. Then, the evaluating doctors may have conducted further tests to determine whether Bible had brain damage as a result of his childhood illnesses.

**[3]** Bible does not contend that he actually suffers from organic brain damage and he submitted no evidence of that; he merely argues that his childhood events are potential causes of brain dysfunction that can be an explanation for violent behavior. Bible's argument, as we see it, relies on speculation that he may have some type of organic brain dysfunction or disorder. This speculation is not sufficient to establish prejudice. *See Gonzalez v. Knowles*, 515 F.3d 1006,

1015-16 (9th Cir. 2008) ("As to the failure to investigate mental health mitigation, Gonzalez does not contend that he actually suffered from a mental illness; he merely argues that *if* tests had been done, and *if* they had shown evidence of some brain damage or trauma, it *might have* resulted in a lower sentence. Such speculation is plainly insufficient to establish prejudice."); *see also King v. Schriro*, 537 F.3d 1062, 1074 (9th Cir. 2008) (concluding that there was no prejudice where the petition did not contain information that would show what the results of a more complete social and medical history would have been); *Raley v. Ylst*, 470 F.3d 792, 802 (9th Cir. 2006) (denying habeas relief where counsel's experts had not conclusively opined the defendant had a mental defect and their testimony would have opened the door to other damaging evidence). Bible does not demonstrate that the results of further testing would have found a brain disorder. In his petition to the PCR court, Bible submitted a brief affidavit from a psychologist who opined that a neurological examination could document the effects of brain damage, but did not express the opinion that Bible suffered from any effects from early illnesses. Bible has not shown that more tests would have discovered and disclosed mitigation evidence sufficient to establish prejudice.

[4] Further, at sentencing his counsel introduced evidence of Bible's potential brain damage from drug and alcohol abuse, and so any further evidence of this speculative brain damage would have been cumulative. The sentencing judge heard that Bible may have brain damage, as well as diminished capacity, due to his extensive drug and alcohol abuse. Phillips presented evidence of Bible's history of drug and alcohol abuse through the expert witness and testimony of family and friends. Phillips also elicited testimony from Mrs. Bible that her son had experienced a difficult childbirth, needed oxygen when he was born, and had a history of high fevers, though he never tied that evidence to any potential for brain damage. Cumulative evidence of diminished capacity, duplicating what was presented, does not create a reasonable

probability that the sentence would have been different. *See Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) ("Even if counsel's actions were deficient, Babbitt cannot show prejudice. Again, the evidence he now seeks to introduce is largely cumulative of the evidence actually presented during the penalty phase."). We conclude that there is no reasonable probability that the judge would have imposed a different sentence in light of Bible's speculative theory of possible brain damage from childhood illnesses. The sentencing judge heard evidence of Bible's potential brain damage and sentenced Bible to death in the face of that evidence. The Arizona Supreme Court, conducting an independent review of the evidence, stated that none of the evidence that Bible's counsel presented qualified as more than de minimis evidence of mitigation. *Bible*, 858 P.2d at 1212.

"In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007) (denying a petition for habeas relief based on extensive aggravating evidence); *Allen v. Woodford*, 395 F.3d at 1008-09 (same). In *Brown*, the defendant had a prior conviction for rape of a young girl, had raped and murdered a young victim in the case, and had called the family after the event, tormenting them. *Brown*, 503 F.3d at 1016. In those circumstances, the additional evidence of the defendant's abuse as a child, his dyslexia, and his attention deficit disorder were insufficient to undermine confidence in the sentence. *Id.* In *Allen*, the defendant proffered many witnesses who would have testified about the poor conditions that he lived in as a child, the loss of his sister during childhood, his hard working nature, his involvement in the church, and the close family ties he had. 395 F.3d at 1002-03. Allen's evidence did not undermine our confidence when considered in light of the defendant's "long history of orchestrating and committing violent robberies and burglaries," his direction of the murder of a witness from prison, and his lack of remorse. *Id.* at 1009. In *Woodford v.*

*Visciotti*, the Supreme Court held that the California Supreme Court's decision—that Visciotti had suffered no prejudice from his counsel's failure to investigate and present evidence of a difficult childhood, seizure disorders, psychological abuse, and brain damage because of overwhelming aggravating factors—was not unreasonable. 537 U.S. 19, 26 (2002) (per curiam). The evidence of a minimal brain injury had been introduced to the jury, though Visciotti's counsel had made some key concessions in closing argument. *Id.* at 25. Nevertheless, because of Visciotti's cold-blooded execution-style crimes, the California Supreme Court's decision that counsel's deficiencies did not undermine confidence in the outcome was not unreasonable. *Id.* at 27.

[5] Bible, like the defendants in *Brown*, *Allen*, and *Visciotti* has a significant amount of aggravating circumstances that he would need to overcome. He had murdered a nine-year-old child in an especially cruel manner. While significant aggravating circumstances do not preclude a conclusion of prejudice, we cannot conclude here that the Arizona court's decision was unreasonable. Bible's speculative evidence does not give rise to a reasonable probability that Bible's sentence would have been different in light of the aggravating factors. It is possible that Bible may have brain damage from childhood illnesses. But Bible's possible brain damage due to drug addiction was presented at the sentencing hearing. None of his mitigation evidence, including his possible brain damage due to his extensive drug use, altered the judge's sentence. We hold that the absence of evidence that was cumulative of what had already been presented and that was speculative in nature does not undermine our confidence in the outcome of Bible's sentencing hearing. Under the applicable standard of review, we cannot properly say that the Arizona court's decision that Bible suffered no prejudice was an unreasonable application of *Strickland*.

Based on the highly deferential AEDPA standard, Bible is not entitled to habeas relief on this claim.[5]

**AFFIRMED.**

---

[5]Bible also raises several other issues that have not been certified for appeal. These include whether Bible was denied a fair trial because of pre-trial publicity, trial publicity, and courtroom atmosphere, whether Bible was denied a fair trial because of the trial court's denial of a motion to change venue, whether Bible received ineffective assistance of counsel at the jury voir dire and the guilt phase of the trial, whether the voir dire was insufficient, whether Bible's Confrontation rights were violated, and whether there was sufficient evidence for the trial court to find the aggravating circumstance that Jennifer's murder was especially cruel. After ordering the parties to brief all of the uncertified issues, we carefully examined each of them, applying the *Miller-El v. Cockrell*, 537 U.S. 322 (2003) standard, which requires a petitioner to " 'demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.' " *Id.* at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). We agree with the district court's determination that these uncertified claims do not meet this standard.