**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ZANE FLOYD,
                    *Petitioner-Appellant*,

v.

TIMOTHY FILSON; ADAM PAUL
LAXALT, Attorney General,
                    *Respondents-Appellees.*

No. 14-99012

D.C. No.
2:06-cv-00471-
PMP-CWH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted January 31, 2019
San Francisco, California

Filed October 11, 2019
Amended February 3, 2020

Before: Marsha S. Berzon, John B. Owens,
and Michelle T. Friedland, Circuit Judges.

Order;
Opinion by Judge Friedland

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Zane Floyd's habeas corpus petition challenging his Nevada conviction and death sentence for four counts of first-degree murder.

As to Floyd's ineffective-assistance-of-trial-counsel claims raised for the first time in his second state petition, which the Nevada Supreme Court denied as untimely and successive, the panel held that because the claims would fail on the merits, it did not need to resolve whether section 34.726 of the Nevada Revised Statutes is adequate to bar federal review, or whether Floyd can overcome his procedural default. The panel held that Floyd's remaining ineffective-assistance-of-counsel claim that was raised and adjudicated in state court fails under AEDPA's deferential standards.

Regarding Floyd's claim that his constitutional rights were violated when the State's expert made reference during his testimony to test results that he had obtained from Floyd's expert, the panel held that the Nevada Supreme Court's conclusion on direct appeal that no constitutional error occurred was not contrary to or an unreasonable application of controlling Supreme Court case law.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Regarding Floyd's claim that the trial court violated his constitutional rights by failing to grant a change of venue, the panel held that the district court did not err when it reasoned that AEDPA limited its review to those materials before the state courts that had rejected the venue claim.

Regarding Floyd's claim that the trial court violated his constitutional rights by permitting the mother of a victim to testify extensively during the penalty phase about her son's difficult life and previous experiences with violent crime, the panel held that the Nevada Supreme Court's conclusion that the admission of the testimony did not unduly prejudice Floyd was not contrary to or an objectively unreasonable application of clearly established federal law.

Reviewing under AEDPA, the panel held that the Nevada Supreme Court's determination that the prosecutor's improper statement that Floyd had committed "the worst massacre in the history of Las Vegas" was harmless was neither contrary to nor an unreasonable application of *Darden v. Wainwright*, 477 U.S. 168 (1986). Reviewing de novo, the panel held that several of the prosecutor's other statements—suggesting that other decisionmakers might ultimately decide whether Floyd received the death penalty, and implying that the jury could sentence Floyd to death to send a message to the community—were improper but did not so affect the fundamental fairness of the proceedings as to violate the Eighth Amendment or result in the denial of due process.

The panel declined to expand the certificate of appealability to include claims challenging Nevada's lethal injection protocol and courtroom security measures that caused certain jurors to see Floyd in prison garb and restraints.

**COUNSEL**

Brad D. Levenson (argued) and David Anthony, Assistant Federal Public Defenders; Rene Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellant.

Jeffrey M. Conner (argued), Deputy Assistant Attorney General; Heidi Parry Stern, Chief Deputy Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellees.

H. Louis Sirkin, Santen & Hughes, Cincinnati, Ohio, for Amicus Curiae National Association for Public Defense.

Thomas C. Sand and Nicholas H. Pyle, Miller Nash Graham & Dunn LLP, Portland, Oregon, for Amicus Curiae The National Organization on Fetal Alcohol Syndrome.

Elizabeth Ballart and William Leiner, Disability Rights California, Oakland, California, for Amici Curiae Disability Law Center of Alaska, Disability Rights California, National Disability Rights Network, and Nevada Disability Advocacy & Law Center.

John L. Krieger, Dickinson Wright PLLC, Las Vegas, Nevada; Justin J. Bustos, Dickinson Wright PLLC, Reno, Nevada; for Amici Curiae Canadian Criminal Justice Professors, Litigators, and Expert Witnesses.

Lisa Rasmussen, Law Office of Lisa Rasmussen, Las Vegas, Nevada, for Amici Curiae The Directors of the Three Research Centers of Birmingham City University's School of Law.

**ORDER**

The opinion filed on October 11, 2019, reported at 940 F.3d 1082, is amended as follows.

On page 12 of the slip opinion, following <whether Floyd can overcome his procedural default and obtain federal review of the merits of his ineffective assistance claims.>, insert the footnote <The arguments in Floyd's opening and reply briefs regarding section 34.726 of the Nevada Revised Statutes address the same ineffective assistance of counsel claims as do his *Martinez* arguments. In Floyd's petition for rehearing, he argues that we should reach other constitutional claims that were also procedurally defaulted by section 34.726. Floyd forfeited any such argument by failing to present it in his opening brief. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).>.

On page 14 of the slip opinion, replace <Floyd's counsel emphasized Floyd's developmental problems and mental illness> with <Floyd's counsel emphasized Floyd's developmental problems and emotional instability>.

On page 15 of the slip opinion, replace <Floyd's other mental illnesses> with <Floyd's other developmental problems>, and delete <on his mental state>.

On page 16 of the slip opinion, replace <the jury already had evidence before it that Floyd suffered from some mental illness and that his illness might have been related to his mother's alcohol use during pregnancy> with <the jury already had evidence before it that Floyd suffered from some developmental problems and that his issues might have been related to his mother's alcohol use during pregnancy>.

On page 17 of the slip opinion, replace <mental illness> with <developmental problems>.

On page 26 of the slip opinion, in the current footnote 5, replace <*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001)> with <*Arpin*, 261 F.3d at 919>.

With these amendments, the panel has unanimously voted to deny Appellant's petition for panel rehearing and rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc is accordingly **DENIED.** No further petitions for panel rehearing or rehearing en banc will be entertained.

---

## OPINION

FRIEDLAND, Circuit Judge:

In 1999, Petitioner-Appellant Zane Michael Floyd shot and killed four people at a Las Vegas supermarket. A Nevada jury found Floyd guilty of four counts of first-degree murder, as well as several related offenses, and sentenced him to death. After the Nevada Supreme Court upheld his conviction and sentence on direct appeal and denied a petition for postconviction relief, Floyd sought a writ of habeas corpus in the United States District Court for the District of Nevada. Following a stay during which Floyd filed an unsuccessful second petition for postconviction relief in state court, the district court denied the federal habeas petition but issued a certificate of appealability as to various claims now before us. We affirm the district court's

decision and deny Floyd's motion to expand the certificate of appealability.

## I.

## A.

Before dawn one morning in June 1999, Floyd called an escort service and asked the operator to send a female escort to his parents' home in Las Vegas, where he had been living since his discharge from the U.S. Marine Corps the previous year. When a young woman sent by the service arrived, Floyd threatened her with a shotgun and forced her to engage in vaginal and anal intercourse, digital penetration, and oral sex. At one point he removed a shell from his shotgun and showed it to her, telling her that her name was on it. He later put on a Marine Corps camouflage uniform and told her that he planned to kill the first nineteen people he saw that morning. Commenting that he would have already shot her had he had a smaller gun on him, he told the woman she had one minute to run before he would shoot her. She escaped.

Floyd then walked about fifteen minutes to an Albertsons supermarket near his home. When he arrived at 5:15 am, he immediately began firing on store employees. He shot and killed four Albertsons employees and wounded another. The store's security cameras captured these events.

When Floyd exited the store, local police were waiting outside. Officers arrested him, and he quickly admitted to shooting the people in the Albertsons. Prosecutors charged Floyd with offenses that included multiple counts of first-degree murder and indicated that they would seek the death penalty.

**B.**

Numerous psychiatric experts examined Floyd and explored his background.  On the day of his arrest, Floyd's public defenders retained Dr. Jakob Camp, a forensic psychiatrist who examined Floyd for three hours.  Dr. Camp concluded that Floyd did not suffer from a mental illness that would impair his ability to stand trial, noted that Floyd's experiences during and after his time in the Marines might have had a bearing on his actions that day, and suggested that counsel obtain Floyd's adolescent health records to learn more about an attention deficit/hyperactivity disorder ("ADHD") diagnosis for which Floyd had been previously treated with the drug Ritalin.  Floyd's counsel eventually obtained records from two doctors who had treated Floyd's mental health issues as an adolescent that confirmed this type of diagnosis.  Those doctors had diagnosed Floyd with attention deficit disorder ("ADD"), although they had also determined that Floyd did not have any significant cognitive deficits.

Shortly before trial, defense counsel also retained clinical neuropsychologist Dr. David L. Schmidt to conduct a full examination of Floyd.  Dr. Schmidt concluded that Floyd suffered from ADHD and polysubstance abuse, but that he showed "[n]o clear evidence of chronic neuropsychological dysfunction."  He also diagnosed Floyd with a personality disorder that included "[p]aranoid, [s]chizoid, and [a]ntisocial [f]eatures."

Discouraged by Dr. Schmidt's findings, which they worried would make Floyd unsympathetic to a jury, counsel turned to clinical neuropsychologist Dr. Thomas Kinsora. After reviewing Dr. Schmidt's report and a report from Floyd's childhood doctor, Dr. Kinsora was highly critical of Dr. Schmidt's work, questioning the validity of the tests that

Dr. Schmidt had conducted. Dr. Kinsora advised Floyd's counsel that it was "not clear whether or not a more comprehensive assessment would have revealed ongoing deficits or not," but that he "wouldn't be surprised to find some continued evidence of neurological problems" in light of the findings of one of the doctors who had examined Floyd as an adolescent. The defense subsequently un-endorsed Dr. Schmidt as an expert, but not before the state trial court ordered it to provide the prosecution a copy of Dr. Schmidt's report along with the associated raw testing data.

Defense counsel also retained Dr. Frank E. Paul, a clinical psychologist and retired Navy officer, who investigated and described in detail Floyd's background and life history. Floyd's mother told Dr. Paul that she had used drugs and alcohol heavily earlier in her life, including when she was pregnant with her first child, but that she "stopped drinking and all drug use when she found herself pregnant with [Floyd] . . . but continued to smoke tobacco." Dr. Paul also learned of an incident in which Floyd, at the age of eight, was accused of anally penetrating a three-year-old boy. Dr. Paul further learned that Floyd began using drugs and alcohol extensively in high school. Dr. Paul described Floyd's Marine Corps deployment to the U.S. base at Guantanamo Bay, Cuba as difficult, explaining that Floyd struggled with the stress and monotony of the deployment and drank extremely heavily during that period. Defense counsel originally named Dr. Paul as an expert but did not call him at trial and never disclosed Dr. Paul's report to the prosecution.

At the guilt phase of Floyd's trial, the jury convicted him of four counts of first-degree murder with use of a deadly weapon, one count of attempted murder with use of a deadly

weapon, one count of burglary while in possession of a firearm, one count of first-degree kidnapping with use of a deadly weapon, and four counts of sexual assault with use of a deadly weapon.

During the penalty phase of Floyd's trial, the State argued that three statutory aggravating factors justified application of the death penalty: killing more than one person, killing people at random and without apparent motive, and knowingly creating a risk of death to more than one person. In arguing that mitigating circumstances weighed against imposition of the death penalty, the defense called (among other witnesses) two experts hired by defense counsel: Dr. Edward Dougherty, a psychologist specializing in learning disabilities and education; and Jorge Abreu, a consultant with an organization specializing in mitigation defense.

Dr. Dougherty diagnosed Floyd with ADHD and a mixed personality disorder with borderline paranoid and depressive features. He also discussed the "prenatal stage" of Floyd's development, and commented that his mother "drank alcohol, and she used drugs during her pregnancy," including "during the first trimester." In rebuttal, the prosecution called Dr. Louis Mortillaro, a psychologist with a clinical neuropsychology certificate, who had briefly examined Floyd and reached conclusions similar to Dr. Schmidt's based on Dr. Schmidt's testing. Abreu painted a detailed picture of Floyd's life, drawing on many of the same facts that Dr. Paul's report had mentioned. He particularly noted Floyd's mother's heavy drinking, including during her pregnancies.

During closing arguments, defense counsel urged the jury to refrain from finding that a death sentence was warranted. The mitigating factors defense counsel relied on

in closing included Floyd's difficult childhood, his alcohol and substance abuse, his stressful military service, his ADD/ADHD, and his mother's substance abuse while she was pregnant with him.

After three days of deliberation, the jury sentenced Floyd to death. It found that all three statutory aggravating factors were present and that they outweighed Floyd's mitigating evidence.

## C.

New counsel represented Floyd on his direct appeal, which the Nevada Supreme Court denied. *Floyd v. State*, 42 P.3d 249 (Nev. 2002) (per curiam). The U.S. Supreme Court then denied certiorari. *Floyd v. Nevada*, 537 U.S. 1196 (2003). Floyd filed a state petition for a writ of habeas corpus a little over a year later. The state trial court denied the petition on the merits, and the Nevada Supreme Court affirmed. *Floyd v. State*, No. 44868, 2006 Nev. LEXIS 851 (Nev. Feb. 16, 2006).

Floyd then filed a pro se habeas petition in the U.S. District Court for the District of Nevada. *See* 28 U.S.C. § 2254(a). The federal public defender was appointed as counsel and filed an amended petition with new allegations, including alleged ineffective assistance by Floyd's trial counsel. The district court agreed with the State that Floyd had not exhausted these new claims in state court and stayed the federal proceedings so he could do so.

Floyd filed a second state habeas petition that included the new claims of ineffective assistance of trial counsel. The state trial court denied this petition on the merits and as untimely filed. The Nevada Supreme Court affirmed, holding that Floyd's second petition was untimely and

successive. *Floyd v. State*, No. 51409, 2010 WL 4675234 (Nev. Nov. 17, 2010).

The federal district court then lifted the stay and reopened Floyd's habeas proceedings. It ultimately granted in part the State's motion to dismiss, concluding that Floyd's new claims that the Nevada Supreme Court had denied as untimely—including his new ineffective assistance of trial counsel claims—were procedurally defaulted, and that Floyd had not shown cause and prejudice for failing to raise his ineffective assistance of trial counsel claims in his first petition. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The district court went on to deny Floyd's remaining claims on the merits, but it issued a certificate of appealability as to several issues, including whether Floyd could show cause and prejudice for the default of his ineffective assistance of trial counsel claims.

Floyd appealed, pressing each of the certified issues and also arguing that we should expand the certificate of appealability to encompass two more. We evaluate each of his arguments in turn.

## II.

We review a district court's denial of habeas corpus de novo. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Floyd's habeas petition. Under AEDPA, we may grant Floyd relief only if the Nevada Supreme Court's rejection of his claims "(1) was contrary to or involved an unreasonable application of clearly established federal law, or (2) was based on an unreasonable determination of the facts." *Davis v. Ayala*, 135 S. Ct. 2187,

2198 (2015). "[C]learly established federal law" in this context refers to law "as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). "Although an appellate panel may . . . look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent," that precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam).

## III.

Floyd asserts numerous claims of ineffective assistance of trial counsel. He raised most of these claims for the first time in his second state petition, prompting the Nevada Supreme Court to deny them as untimely and successive. *Floyd v. State*, No. 51409, 2010 WL 4675234, at *1 (Nev. Nov. 17, 2010). The Nevada Supreme Court held that the ineffective assistance of counsel claims raised for the first time in Floyd's second state habeas petition were procedurally barred under section 34.726 of the Nevada Revised Statutes, which states that absent "good cause shown for delay, a petition that challenges the validity of a judgment or sentence must be filed within 1 year" after conviction or remittitur of any denied appeal "taken from the judgment." Nev. Rev. Stat. § 34.726(1).

Unless a petitioner can show "cause and prejudice," federal courts in habeas actions will not consider claims decided in state court on a state law ground that is independent of any federal question and adequate to support the state court's judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Floyd and the State disagree about whether section 34.726, as applied in his case, is adequate to bar

federal review.[1]  Floyd contends that when he filed his second state habeas petition in 2007, Nevada did not clearly and consistently apply section 34.726 to bar successive petitions alleging ineffective assistance of counsel in capital cases.  He further argues that, even if the state law is adequate, he can establish cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012), based on ineffective assistance of initial state habeas counsel in failing to raise claims of ineffective assistance of trial counsel.

Given that Floyd's underlying ineffective assistance of trial counsel claims lack merit, we need not resolve whether the state law is adequate or, if it is, whether Floyd can overcome his procedural default and obtain federal review of the merits of his ineffective assistance claims.[2]  *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002). Even if we held in Floyd's favor on either of those questions and thus reached the merits of Floyd's ineffective assistance

---

[1] The Nevada Supreme Court also held that Floyd's new claims were barred by section 34.810 of the Nevada Revised Statutes, which requires dismissal of claims that could have been raised in an earlier proceeding. Nev. Rev. Stat. § 34.810(1)(b)(3).  On appeal, the State does not contest the district court's determination that this application of section 34.810 was inadequate, and so it does not bar federal review, because the rule was not consistently applied at the time of Floyd's purported default.

[2] The arguments in Floyd's opening and reply briefs regarding section 34.726 of the Nevada Revised Statutes address the same ineffective assistance of counsel claims as do his *Martinez* arguments. In Floyd's petition for rehearing, he argues that we should reach other constitutional claims that were also procedurally defaulted by section 34.726.  Floyd forfeited any such argument by failing to present it in his opening brief. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

of trial counsel claims, we would affirm the district court's denial of relief.[3]

## A.

To succeed on an ineffective assistance of counsel claim, Floyd must show that his counsel's performance "fell below an objective standard of reasonableness," and that, if so, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). With respect to the prejudice requirement, the Supreme Court has cautioned that "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). To determine the risk of such prejudice at the penalty phase of a capital trial, we consider whether it is reasonably probable that the jury otherwise "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" in light of "the totality of the evidence" against the petitioner. *Strickland*, 466 U.S. at 695.

## B.

Floyd's primary ineffective assistance of trial counsel claim is that his trial counsel failed to investigate and present mitigation evidence showing that Floyd suffers from fetal alcohol spectrum disorder ("FASD") as a result of his mother's alcohol consumption while he was in utero. In

---

[3] Nor is a remand to the district court for further evidentiary development appropriate because only "a habeas petitioner who asserts a *colorable* claim to relief . . . is entitled to an evidentiary hearing." *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir. 1994) (emphasis added).

support of this claim, Floyd offers a report from FASD expert Dr. Natalie Novick Brown. After reviewing the trial court record and other experts' examinations of Floyd, Dr. Brown concluded that Floyd suffered from FASD and that the disorder could explain his actions on the day of the shooting. Floyd argues it is reasonably probable that had jurors been presented with evidence of FASD and its effects, they would have spared him a death sentence. Floyd acknowledges that trial counsel consulted seven experts, none of whom diagnosed Floyd with FASD, but he contends that those experts were inadequately prepared and lacked the expertise to present proper mitigating evidence regarding FASD.

We need not resolve whether Floyd's counsel's performance was deficient in failing to present expert testimony that Floyd suffers from FASD. Even assuming it was, there is no reasonable probability that, had the jury heard from an FASD expert, it would have concluded that mitigating factors outweighed aggravating factors such that Floyd did not deserve a death sentence.

The State presented an extremely weighty set of aggravating factors at sentencing. First, the State charged that Floyd "created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person." Nev. Rev. Stat. § 200.033(3). Second, it alleged that Floyd killed more than one person (indeed, four) during the course of the offense that led to his conviction. *See id.* § 200.033(12). Third, it alleged that the killings were at random and without apparent motive, because Floyd "just went to a place where he knew 18 people would be and shot everybody he could see." *See id.* § 200.033(9). The jury

unanimously found that all three aggravating circumstances existed with regard to all four victims.

In response, Floyd's counsel emphasized Floyd's developmental problems and emotional instability, issues exacerbated by his early life experiences and military service. Counsel's mitigation arguments included multiple references to Floyd's mother's drinking while Floyd was in utero—a point that both mitigation consultant Abreu and Dr. Dougherty emphasized as well. Counsel and Dr. Dougherty both explicitly opined that Floyd's mother's substance abuse might be to blame for Floyd's mental condition. All in all, Floyd's counsel argued that Floyd acted "under the influence of extreme mental or emotional disturbance," and that he "suffer[ed] from the effects, early effects of his mother's drinking, her ingested alcohol, drugs early on in her pregnancy."

Consistent with these defense arguments, the mitigation instructions submitted to the jury included that Floyd's "[m]other use[d] alcohol and drugs during early pregnancy," that Floyd had been born prematurely, that the murders were committed while Floyd was under the influence of "[e]xtreme [m]ental or [e]motional [d]isturbance," and that Floyd had been "[i]nsufficiently [t]reated for ADHD [and] other [e]motional-[b]ehavioral [p]roblems including [d]epression." Maternal alcohol and drug use was the first mitigating factor on the list.

Given the defense's focus on Floyd's mother's drinking during pregnancy and its effects, testimony by an FASD expert would likely not have changed any juror's balancing of mitigating versus aggravating circumstances. For Floyd to have been prejudiced by the lack of testimony by an FASD expert, at least one juror would have had to have considered a formal FASD diagnosis more severe and

debilitating than ADD/ADHD and Floyd's other developmental problems, which the defense had suggested included effects of his mother's drinking and drug use during pregnancy, but without using FASD terminology. In other words, at least one juror would have had to view a formal FASD diagnosis as a weightier mitigating factor than those presented. And that juror would have had to have placed so much additional weight on the FASD defense as to cause the mitigating circumstances to outweigh the State's significant aggravating evidence, even though they did not on the record before the jury. Both the limited additional contribution of the FASD mitigating factor as compared with the mitigation evidence presented and the especially shocking nature of Floyd's crime, during which he killed multiple unarmed people at close range, without provocation, and in their workplace, makes that switch in outcome unlikely. Given that the jury already had evidence before it that Floyd suffered from some developmental problems and that his issues might have been related to his mother's alcohol use during pregnancy, and given the extreme aggravating circumstances, it seems very unlikely—and so not reasonably probable—that any juror would have had these reactions.

This conclusion comports with our previous holdings that a capital petitioner is not necessarily prejudiced when counsel fails to introduce evidence that differs somewhat in degree, but not type, from that presented in mitigation. In *Bible v. Ryan*, 571 F.3d 860 (9th Cir. 2009), for instance, we held that a capital petitioner was not prejudiced by his attorney's failure to introduce medical evidence that he suffered from neurological damage. *Id.* at 870. We reasoned that because counsel presented evidence that the petitioner might have had brain damage from persistent drug and alcohol abuse, along with evidence of childhood events that

could have led to brain damage, medical evidence of neurological damage would have been different only in degree. *Id.* at 871. Floyd's FASD argument resembles that of the petitioner in *Bible*—the jury heard the evidence that would have supported the FASD diagnosis as well as the implication that the evidence explained Floyd's behavior. And like the petitioner in *Bible*, who "murdered a nine-year-old child in an especially cruel manner," Floyd "has a significant amount of aggravating circumstances that he would need to overcome," *id.* at 872, making it unlikely that the jury would have imposed a different sentence based on mitigating evidence that differed only in degree from that which Floyd presented at trial.

Floyd urges us to follow the Fourth Circuit's decision in *Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019), *petition for cert. docketed*, No. 18-1495 (May 31, 2019), in which that court affirmed a district court's conclusion that a capital petitioner's counsel had performed constitutionally deficiently in failing to present evidence of fetal alcohol syndrome in mitigation, and that the petitioner was prejudiced by this failure. *Id.* at 319. In some cases, FASD evidence might be sufficiently "different from . . . other evidence of mental illness and behavioral issues" to raise a reasonable probability that a juror would not have imposed the death penalty had it been presented. *Id.* at 318. But much distinguishes Floyd's case from that of the petitioner in *Williams*. Floyd's lawyers and experts explicitly argued that his mother's alcohol use while she was pregnant led to his developmental problems in some form and therefore helped explain his actions, whereas trial counsel in *Williams* investigated the petitioner's mother's drinking "as evidence of [the petitioner's] difficult childhood, not of [fetal alcohol-related disorders]" and never offered evidence to the jury that the drinking could have caused Williams's cognitive

issues. *Id.* at 309. The State submitted against Floyd three aggravating factors, all involving a multiple-victim shooting, whereas in *Williams* "the State only presented one aggravating factor: that the [single] murder occurred in the commission of a kidnapping." *Id.* at 318. The jury that imposed the death sentence on Floyd did not report difficulty reaching a verdict, whereas in *Williams* "the jury sent a note to the trial court stating it was deadlocked nine to three in favor of death." *Id.* at 308. In short, the petitioner in *Williams* was prejudiced because his lawyers presented a much weaker-than-available mitigation argument that was insufficient to overcome an also weak aggravating argument that clearly troubled some jurors.[4] That was not the situation here. We also note that our conclusion is consistent with the Fifth Circuit's in *Trevino v. Davis*, 861 F.3d 545 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1793 (2018), in which that court rejected an ineffective assistance of counsel claim relating to the failure to present mitigating evidence of an FASD diagnosis because the evidence would have been outweighed by what the court viewed as very substantial aggravating evidence. *Id.* at 549–51.

Floyd further argues that counsel provided deficient performance in the penalty phase by failing to call Dr. Paul, the consulting military and mental health expert, to testify about Floyd's military service, early life, and other matters. We are skeptical that declining to call this expert was constitutionally deficient. *See Hinton v. Alabama*, 571 U.S.

---

[4] Floyd's postconviction investigator interviewed one juror who stated that evidence of a "serious mental illness" would have "weighed heavily" in her sentencing-phase deliberations. It does not follow that this juror would have deemed FASD a sufficiently severe condition to mitigate Floyd's offenses, especially because she appears to have considered insufficient the existing evidence of potential ties between maternal alcohol use and Floyd's state of mind.

263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" (alterations in original) (quoting *Strickland*, 466 U.S. at 690)). Even assuming that counsel's choice in this regard was deficient, it did not prejudice Floyd. Like Floyd's FASD evidence, Dr. Paul's testimony would have been largely cumulative of the evidence of Floyd's substance abuse and mental health struggles actually presented at trial, and the testimony therefore would have done little to offset the weighty aggravating evidence against Floyd.

## C.

Floyd argues that his trial counsel's conduct during jury selection amounted to ineffective assistance of counsel. We disagree. Much of his argument supposes that various decisions by the trial court prejudiced him during jury selection, that those decisions were erroneous, and that his counsel was ineffective in failing to object to or otherwise remedy these errors. But most of the trial court decisions he challenges were not errors at all, and with respect to any that may have been errors, we conclude that his counsel acted within the bounds of professional competence in responding to the court's decisions.

For example, Floyd contends that his counsel erred in failing to successfully object to the trial court's dismissal of two prospective jurors. Floyd first argues that the trial court improperly or pretextually removed one venireperson from the venire for cause. Even assuming that the trial court erred in doing so, this does not show that Floyd's counsel was ineffective. On the contrary, Floyd's counsel attempted to rehabilitate the prospective jurors who had expressed hesitation about the death penalty, including the juror in

question, and to allay the court's concerns. After the juror stated that she had scruples about the death penalty, counsel elicited a response from her that she "would have to follow the law." But she then admitted that she would "invariably in all cases give a sentence less than death," and the trial court dismissed her for cause.

Floyd next argues that the court improperly dismissed a second venireperson for improper concerns about language ability. After it came to light that this prospective juror was not a native English speaker, defense counsel questioned him about his degree from an English-speaking university. Nonetheless, the court concluded that the juror's English fluency was insufficient, stating that it could "not take a chance where the stakes [were] so high to both sides."

That the trial court dismissed these two potential jurors does not mean that counsel's attempts to rehabilitate them were deficient and that competent counsel would have sufficiently rehabilitated the two to keep them on the jury, especially because the court appears to have had legitimate concerns about both.

Floyd similarly argues that because the trial court refused to excuse allegedly biased venirepersons for cause, counsel wasted peremptory challenges on striking those individuals from the jury pool. It appears, however, that the trial court made no error by refusing to dismiss the prospective jurors in question. One of them, for instance, retracted her statement that she could not consider a sentence of life with parole after the trial court clarified that she was only required to "at least consider" it. And again, even if the trial court erred, Floyd's counsel's reaction was within the realm of permissible strategic choices: counsel chose between the two (admittedly unattractive) options of spending a peremptory challenge or taking the risk of seating a juror that counsel

had concluded would be unfavorable to Floyd. In other words, Floyd's counsel was not ineffective for attempting to make the best of the trial court's alleged errors.

Finally, Floyd contends in general terms that the voir dire format, in which the prosecution questioned all prospective jurors before the defense was permitted to question any, was prejudicial or caused his counsel to be ineffective. We struggle to discern precisely Floyd's theory of deficient performance or of prejudice. Even assuming that the trial court's format was prejudicial, counsel did object to it by moving for "attorney conducted, sequestered individual *voir dire*." Trial counsel's attempt to challenge the trial court's procedures shows diligence, not ineffectiveness.

Moreover, Floyd's lawyers had the opportunity to individually question numerous prospective jurors, eliciting information about their views on topics including the death penalty, psychology, alcoholism, and how they would behave in a jury room. Counsel's decision not to further question each venireperson about his or her exposure to media coverage of the shooting and ability to consider mitigating evidence was not deficient. The questionnaires that every prospective juror completed asked about these issues, and the trial court asked all prospective jurors if "there [is] anybody among you who feels unable to set aside what they've read, seen, or heard" about the case. Floyd's counsel were entitled to rely on those responses, and their mere failure to inquire further does not render their performance deficient. *See Fields v. Woodford*, 309 F.3d 1095, 1108 (9th Cir. 2002) ("[W]e cannot say that failure to inquire beyond the court's voir dire was outside the range of reasonable strategic choice or that it would have affected the outcome."); *Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (rejecting argument "that trial counsel rendered

ineffective assistance by failing to focus on his client's criminal history during voir dire to discover potential juror prejudice and determine whether jurors could follow limiting instructions on such a history").

## D.

Floyd's counsel was not ineffective in cross-examining the State's penalty-phase psychological expert witness, Dr. Mortillaro. Dr. Mortillaro reviewed the guilt-phase record materials and other psychological experts' reports and data, including Dr. Schmidt's unfavorable test results that the defense provided the prosecution in discovery before it un-endorsed Dr. Schmidt. Dr. Mortillaro also interviewed Floyd himself. Based on these materials, Dr. Mortillaro opined that—contrary to defense expert Dr. Dougherty's testimony—Floyd had not suffered brain damage, was of average IQ, did not suffer delusions, could tell right from wrong, and was not mentally ill.

On cross-examination, defense counsel elicited testimony from Dr. Mortillaro that he had only interviewed Floyd for about ninety minutes and that he had only received Dr. Dougherty's report the day before. Counsel also attempted to undermine Dr. Mortillaro's reliance on Floyd's scores from tests administered by Dr. Schmidt as the basis for Dr. Mortillaro's conclusion, arguing that the results should have been thrown out entirely. Counsel succeeded in getting Dr. Mortillaro to admit that any individual psychologist has significant discretion in deciding whether the test score was valid enough to allow reliance on the raw data. Counsel then pointed out that Dr. Dougherty had looked at the same data and diagnosed Floyd with dissociative personality disorder rather than borderline personality disorder, and he elicited an admission from

Dr. Mortillaro that individuals with borderline personality disorder may show dissociative symptoms.

Finally, counsel attempted to undermine Dr. Mortillaro's minimization of Floyd's ADD/ADHD. Counsel presented Dr. Mortillaro with his own prior testimony from another matter in which Dr. Mortillaro had stated "that 70 percent of those with attention deficit [disorder] still have it as an adult." Dr. Mortillaro also conceded that even if a patient were to "outgrow" ADD or ADHD, the fallout from the childhood disorder "would stay with them."

Floyd generally faults counsel for choosing to rely on cross-examination of Dr. Mortillaro rather than calling Floyd's other consulting expert, Dr. Kinsora, to rebut Dr. Mortillaro's testimony. The caselaw does not support Floyd's argument. In prior cases in which we and other circuits have recognized constitutionally deficient cross-examination, there were glaring failures to ask even basic questions, not—as here—a strategic choice between one means of undermining the witness and another. *See, e.g.*, *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–13 (9th Cir. 2006) (counsel ineffective for failing to ask *any* questions about a $25,000 reward that might have motivated key witnesses' testimony against the defendant); *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006) (ineffective assistance where counsel did not cross-examine key prosecution witness at all because he felt unprepared to do so, even though he "had plenty of ammunition with which to impeach [the witness's] testimony").

Floyd does not contend that counsel failed altogether to cross-examine Dr. Mortillaro about key issues, but rather that he failed to do so in a manner that Floyd now believes would have been more effective. But Floyd's counsel did attempt to impeach Dr. Mortillaro's testimony, including

with information counsel obtained from experts he had hired.  This was not constitutionally deficient performance.

## E.

Floyd argues that his trial counsel was ineffective for failing to object to various jury instructions.  Many of the arguments against the instructions Floyd now challenges would not have been legally supported or would have been foreclosed by then-governing law, so counsel was not ineffective for failing to raise them.

First, we disagree with Floyd that the jury should have been instructed at the penalty phase that it could impose a death sentence only if it found that aggravating factors outweighed mitigating factors beyond a reasonable doubt.  Floyd contends that the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), required that the jury instructions include such a statement about burden of proof.  The Court in *Apprendi* held that, subject to an exception for prior convictions, "any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id.* at 490 (emphasis added).  Floyd characterizes the balance of aggravating and mitigating circumstances as a "fact" governed by this rule.

The federal courts of appeals that have considered this argument have uniformly rejected it, holding that a jury's balancing inquiry in a capital case is a subjective and moral one, not a factual one.  *See United States v. Gabrion*, 719 F.3d 511, 532–33 (6th Cir. 2013) (en banc); *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Barrett*, 496 F.3d 1079, 1107–08 (10th Cir. 2007); *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31–32 (1st Cir.

2007); *United States v. Purkey*, 428 F.3d 738, 749–50 (8th Cir. 2005).[5]  Floyd's proposed instruction thus hardly flowed naturally from *Apprendi*, which did not involve a capital case and was decided just months before Floyd's trial began.  Floyd's counsel was not deficient for failing to make an argument that was untested, an extension of newly minted law, and (judging from the weight of subsequent authority) likely to fail.  *See Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

Second, Floyd's counsel was not ineffective for failing to challenge on constitutional grounds the penalty-phase jury instructions for the aggravating circumstance that "[t]he murder was committed upon one or more persons at random and without apparent motive."  At the time of Floyd's trial, the Nevada Supreme Court had already rejected an identical constitutional challenge to this aggravating factor.  *See Geary v. State*, 930 P.2d 719, 727 (Nev. 1996).  Counsel was not ineffective for failing to raise this argument.

---

[5] We have never directly ruled on this question—nor do we today—but we have at least twice expressed our skepticism of Floyd's view.  *See Ybarra v. Filson*, 869 F.3d 1016, 1030–31 (9th Cir. 2017); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007).  Floyd also argues that counsel should have requested a reasonable doubt instruction based on the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which applied the principle from *Apprendi* to hold that every sentence-enhancing fact, "no matter how the State labels it," must be found beyond reasonable doubt.  *Id.* at 602.  *Ring* was decided two years after Floyd's trial.  In addition, *Ybarra* and *Mitchell*, as well as other circuits' decisions rejecting that argument, post-date *Ring* and thus defeat this version of Floyd's claim as well.

Third, no *Strickland* violation occurred when Floyd's counsel declined to challenge a guilt-phase jury instruction that premeditation, an element of first-degree murder, "may be as instantaneous as successive thoughts of the mind." Even assuming that this instruction was improper and that counsel's decision not to challenge it was unreasonable, no prejudice resulted from use of the instruction. The jury had before it significant evidence that Floyd's premeditation occurred in more than an instant. Among other things, he told his sexual assault victim that he planned to kill the first nineteen people he saw, then walked for fifteen minutes carrying the shotgun that he used to perpetrate the murders. Even if counsel had succeeded in striking the "instantaneous premeditation" instruction, there is no reasonable probability that the jury would have found a lack of premeditation as a result. *See Strickland*, 466 U.S. at 694.

## F.

Floyd's remaining claim of ineffective assistance—that his trial counsel should have objected to Nevada's use of the "great risk of death" aggravating circumstance—was raised and adjudicated in state court, so we review it under AEDPA's deferential standards. The claim fails under those standards.

Floyd contends that his trial counsel should have objected to this aggravating circumstance as duplicative of another aggravating circumstance—the "multiple murders" factor—that the State charged. *See* Nev. Rev. Stat. § 200.033(3). Initial post-conviction counsel presented a nearly identical argument[6] to the Nevada Supreme Court,

---

[6] To the extent Floyd is now making a new argument that this aggravating circumstance was impermissibly vague, we hold that

which rejected it on the merits. The Nevada Supreme Court held that the two aggravators were based on different facts and served different state interests. It reasoned that "[o]ne is directed against indiscriminately dangerous conduct by a murderer, regardless of whether it causes more than one death; the other is directed against murderers who kill more than one victim, regardless of whether their conduct was indiscriminate or precise." *Floyd v. State*, No. 44868, 2006 Nev. LEXIS 851 (Nev. Feb. 16, 2006). Floyd argues in a conclusory fashion that this decision was "arbitrary and capricious" such that it was contrary to or an unreasonable application of clearly established federal law, but he cites no controlling Supreme Court precedent relevant to this argument. His briefing focuses entirely on the legislative history of Nevada's aggravating factors and what he contends are two conflicting strains of doctrine in that state's jurisprudence on the "great risk of death factor." These state law issues are not grounds for federal habeas relief, and we are aware of no clearly established federal law that the Nevada Supreme Court's determination might have contravened. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (holding that "clearly established Federal law" refers only to U.S. Supreme Court decisions at time of alleged violation).

---

argument lacks merit. "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam). To the extent that Floyd is making a new argument in his reply brief that substantial evidence did not support this jury instruction, we hold that Floyd forfeited any such argument by failing to articulate it in his opening brief. *See Arpin*, 261 F.3d at 919.

## IV.

Floyd argues that his constitutional rights were violated when the State's expert, Dr. Mortillaro, made reference during his testimony to test results that he had obtained from Floyd's expert, Dr. Schmidt. The Nevada Supreme Court's conclusion on direct appeal that no constitutional error occurred, *Floyd v. State*, 42 P.3d 249, 258–59 (Nev. 2002) (per curiam), was not contrary to or an unreasonable application of controlling Supreme Court caselaw.

Floyd argues at length that the Nevada Supreme Court wrongly determined that Dr. Schmidt's report was not privileged work product.[7] Although the Nevada Supreme

---

[7] Floyd argues that his counsel were ordered to turn over Dr. Schmidt's report "before defense counsel had even seen the report of their expert." That assertion is misleading. The court ordered the defense to provide a copy of Dr. Schmidt's report "before the close of business on June 15, 2000." Dr. Schmidt's report is dated June 13, 2000. In his declaration, Floyd's counsel describes a phone call with Dr. Schmidt on June 14 where Dr. Schmidt informed counsel that he was "unable to find any neurological basis for Mr. Floyd's actions." "Upon talking with Dr. Schmidt," counsel "became skeptical about the quality of his testing and decided to hire Dr. Kinsora" to review Dr. Schmidt's testing and analysis. So Floyd's counsel knew basically what would be in Dr. Schmidt's report before they turned it over, whether or not they had seen the actual report. Counsel had the opportunity to withdraw Dr. Schmidt as an expert before turning over his report, as they previously had done with Dr. Paul, but failed to do so. And Floyd's counsel admits that there was "no strategic reason to turn over a report that [they] were not sure about using." In light of this timeline, Floyd's argument that the prosecution's use of Dr. Schmidt's data violated the work-product privilege might be more accurately framed as a result of a poor strategic choice on defense counsel's part not to withdraw Dr. Schmidt as an expert, which could in turn be grounds for an ineffective assistance of counsel claim. *See McClure v. Thompson*, 323 F.3d 1233, 1242–43 (9th Cir. 2003). But no such claim is before us.

Court drew on federal authority in reaching that conclusion, Floyd "simply challenges the correctness of the state evidentiary rulings," and "he has alleged no deprivation of federal rights" that could entitle him to relief. *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). He similarly argues that the Nevada Supreme Court misapplied its own precedent, but a state court's misreading of *state* law is not a ground for federal habeas relief.

*Ake v. Oklahoma*, 470 U.S. 68 (1985), does not support Floyd's challenge to the use of Schmidt's report either. The Supreme Court in *Ake* held that "due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase" of a capital case. *Id.* at 84. Floyd received ample psychiatric evaluations and assistance prior to sentencing, so *Ake* has little bearing here.

Floyd further contends that our extension of *Ake* in *Smith v. McCormick*, 914 F.2d 1153, 1158–59 (9th Cir. 1990), should have compelled the Nevada Supreme Court to reach a different result. In *Smith*, we held that a capital defendant's due process rights[8] were violated when, instead of permitting an independent psychiatric evaluation, the trial court ordered a psychiatrist to examine the defendant and

---

[8] Floyd asserted in passing in his opening brief before this court that the disclosure and use of Dr. Schmidt's report violated his Fifth Amendment rights against self-incrimination but provided no developed argument supporting that assertion. We therefore express no view on that issue. *See e.g.*, *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." (internal citations omitted)).

report directly to the court at a resentencing hearing.  *Id.* at 1159–60.  We reasoned that the petitioner's "counsel was entitled to a confidential assessment of such an evaluation, and the strategic opportunity to pursue other, more favorable, arguments for mitigation."  *Id.* at 1160.

Floyd appears to argue that because, under *Smith*, a defendant is entitled to a confidential assessment of the state-provided psychiatric assessment and the chance to pursue other strategies, he was entitled to claw back a document that was disclosed in connection with designating an expert to testify after he reversed course and removed the expert from his witness list.  The holding in *Smith* did not encompass what Floyd seeks here, so the Nevada Supreme Court did not act contrary to our precedent.  And, in any event, Floyd's proposed rule is not clearly established by any Supreme Court decision.  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam).

Indeed, the Supreme Court has held that mandatory disclosure schemes are permissible in criminal trials as long as they do not structurally disadvantage the defendant.  *See Wardius v. Oregon*, 412 U.S. 470, 472 (1973) ("We hold that the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules *unless reciprocal discovery rights are given to criminal defendants*." (emphasis added)).  Nevada provides for reciprocal discovery, as it did at the time of Floyd's trial, so *Wardius* was not contravened here.  *See* Nev. Rev. Stat. § 174.234 (1999).

## V.

Floyd next contends that the trial court violated his constitutional rights by failing to grant a change of venue.**[9]** He argues that the district court erred when it rejected this claim in part on the ground that, of the 115 news articles Floyd submitted with his federal habeas petition to attempt to show that the jury was exposed to prejudicial pretrial publicity about his case, only three were in the record before the state courts. Relying on *Cullen v. Pinholster*, 563 U.S. 170 (2011), the district court reasoned that AEDPA limited its review to those materials before the state courts that had rejected Floyd's venue claim. *See id.* at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").

The district court did not err. Floyd argues that, under *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), the district court misapplied *Pinholster* to bar consideration of his 112 new articles. Floyd's reliance on *Dickens* is misplaced. In *Dickens*, we held that AEDPA (as interpreted in *Pinholster*) did not bar a federal court from considering new evidence introduced to support a *Martinez* motion alleging ineffective assistance of trial and postconviction counsel as cause and prejudice for a procedural default. *Dickens*, 740 F.3d at 1319–20. Here, by contrast, Floyd faults the district court for failing to consider new evidence

---

**[9]** In Floyd's opening brief, he asserts in a section heading that the district court also erred by failing to consider his claim that the trial court violated his rights by refusing to sever the sexual assault charges against him from the murder charges. But he does not actually argue this point or explain the alleged error, so we consider any such argument forfeited. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

in the context of a change of venue claim decided on its merits in the state court and so reviewed under AEDPA deference. Floyd's theory about how the Nevada Supreme Court erred has nothing to do with trial counsel's performance and therefore does not implicate the *Dickens* rule.

Because Floyd makes no argument beyond the district court's refusal to consider these documents—which we conclude was not error—we need not consider whether the Nevada Supreme Court's denial of Floyd's venue claim was contrary to or unreasonably applied clearly established federal law.

## VI.

Floyd argues, as he did on direct appeal, that the trial court violated his constitutional rights by permitting the mother of victim Thomas Darnell to testify extensively during the penalty phase about her son's difficult life and previous experiences with violent crime. The Nevada Supreme Court held that parts of Nall's testimony "exceeded the scope of appropriate victim impact testimony" and should not have been admitted under state evidentiary law, but that their admission did not unduly prejudice Floyd such that it rendered the proceeding fundamentally unfair. *Floyd v. State*, 42 P.3d 249, 262 (Nev. 2002) (per curiam). The Nevada Supreme Court's rejection of this claim was not contrary to or an objectively unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d).

The prosecution called Mona Nall, Darnell's mother, to offer victim impact testimony during the penalty phase of trial. Nall told the jury how Darnell had thrived in the face of serious learning and developmental disabilities, going on to form close relationships with his family and members of

the community. She testified that "the hurt has gone so deep" for those affected by his death. Nall also recounted an incident years earlier in which Darnell and his family had been kidnapped by two men who held the family hostage and sexually assaulted Nall's daughter. Defense counsel objected twice to this testimony and the trial court admonished the prosecution to "get to th[e] point."

The Nevada Supreme Court did not unreasonably apply the relevant clearly established federal law in rejecting Floyd's claim that this testimony violated his due process rights. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that in a penalty-phase capital trial, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. The Court added that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986)).

Like the Nevada Supreme Court, we are troubled by the admission of some of Nall's testimony. That court determined that although *Payne* did not necessarily bar Nall's testimony about the hostage-taking and kidnapping incident, those parts of her testimony should not have been admitted under state evidentiary law because of its limited relevance and high risk of prejudice. We are additionally concerned about the propriety of Nall's testimony about Darnell's early life and developmental difficulties because of its limited relevance to Floyd's impact on the victims (or on people close to and surviving them) and its potential risk of prejudice. Eliciting extensive testimony about a horrible

crime that had nothing to do with the defendant risks inappropriately affecting jurors who might feel that the victim's family should be vindicated for all of its tragedies, not just for the one caused by Floyd.

Nevertheless, it was not unreasonable for the Nevada Supreme Court to conclude that the admission of Nall's testimony did not render Floyd's trial fundamentally unfair. Given the strength of the prosecution's aggravating case against Floyd, it seems unlikely that the jury was substantially swayed by the irrelevant parts of Nall's testimony.  The same characteristics that made Nall's testimony so objectionable—that it had nothing to do with Floyd's crimes or, at times, with Floyd's victims—could have diminished the testimony's effect on the jury.

The prosecutor indirectly referenced the irrelevant portions of Nall's testimony in closing argument when he commented on "the tremendous tragedies . . . that Mona has suffered and had suffered with her son over the years, so many tragedies, so many hardships."  But this comment lacked detail and was in the context of a long description of the victim impact of Floyd's crime, so the prosecution does not appear to have relied extensively on the improper testimony.  In the face of the robust aggravating evidence that the State presented, the Nevada Supreme Court did not unreasonably apply clearly established Supreme Court law by holding that Floyd was not prejudiced by Nall's statement or by the prosecutor's references to it, so there was no due process violation. *See Payne*, 501 U.S. at 825.  For the same reasons, any error in permitting Nall's testimony about Darnell's early life was harmless as there is no evidence that the testimony had "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

*Abrahamson*, 507 U.S. 619, 638 (1993) (quotation marks omitted).

## VII.

Floyd challenges numerous statements made by the prosecution as misconduct amounting to constitutional error.[10]  We agree that a subset of these statements was improper, but we hold that the impropriety is not a ground for habeas relief under the relevant standards of review.

The due process clause provides the constitutional framework against which we evaluate Floyd's claims of prosecutorial misconduct.  "The relevant question" under clearly established law "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (holding that *Darden* provides relevant clearly established law on habeas review of claims that statements by prosecutors amounted to prosecutorial misconduct).  In making that determination, courts look to various

> *Darden* factors—i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and

---

[10] The district court determined that Floyd had exhausted all of these claims, and the State does not challenge that ruling.

whether defense counsel had an adequate
opportunity to rebut the comment.

*Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010). As the
Supreme Court emphasized in *Darden*, "it is not enough that
the prosecutors' remarks were undesirable or even
universally condemned," 477 U.S. at 181 (citation omitted),
because the effect on the trial as a whole needs to be
evaluated in context. *See United States v. Young*, 470 U.S.
1, 17–20 (1985) (prosecutor's exhortation that the jury "do
its job" and statements of personal belief were improper, but
they did not have prejudicial effect on the trial as a whole in
light of the comments' context and overwhelming evidence
of guilt).

## A.

In his direct appeal and first habeas petition, Floyd
presented several claims that the prosecutor's statements
amounted to misconduct; we review those adjudicated
claims under AEDPA. We agree with the Nevada Supreme
Court that the prosecutor's contention that Floyd had
committed "the worst massacre in the history of Las Vegas"
was improper. *Floyd v. State*, 42 P.3d 249, 260–61 (Nev.
2002) (per curiam). That court's further determination that
the comment was harmless, *id.* at 261, was not unreasonable.
Although the Nevada Supreme Court cited the state's
codified harmless error doctrine, *see* Nev. Rev. Stat.
§ 178.598, and not *Darden*, its reasoning can also be
understood as concluding that Floyd had not shown that the
misconduct "so infected the trial with unfairness" as to work
a denial of his due process rights. *Darden*, 477 U.S. at 181
(quotation marks omitted).

This conclusion was not objectively unreasonable under
the *Darden* factors. Although the "worst massacre"

comment came late in the trial and was not invited by the defense, the weight of the evidence against Floyd and the fact that the comment was not egregiously inflammatory make the Nevada Supreme Court's determination reasonable. In *Darden*, for instance, the prosecutor made a series of comments far more inflammatory than this one.[11] The Supreme Court nonetheless held that those comments did not render the petitioner's trial fundamentally unfair in light of the defense's response and the strong evidence against the petitioner. *Id.* at 180–83. And although the trial court here did not specifically direct jurors to ignore the prosecutor's "worst massacre" comments, it did instruct them that "arguments and opinions of counsel are not evidence." The Nevada Supreme Court's determination was therefore neither contrary to nor an unreasonable application of *Darden*.

## B.

Floyd raised additional claims in his second state habeas petition that statements by the prosecutor amounted to misconduct. The Nevada Supreme Court held that those claims were procedurally barred, *Floyd v. State*, No. 51409, 2010 WL 4675234, at *1 (Nev. Nov. 17, 2010), but because

---

[11] *Darden* enumerated a few of the prosecutor's statements: "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." "I wish [the victim] had had a shotgun in his hand when he walked in the back door and blown [the petitioner's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun." "I wish someone had walked in the back door and blown his head off at that point." "He fired in the boy's back, number five, saving one [round]. Didn't get a chance to use it. I wish he had used it on himself." "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time." 477 U.S. at 180 n.12.

the State has forfeited any objection to the district court's decision to review them on the merits nonetheless, we consider them de novo.

Most of these claims are meritless, but we note two troubling arguments made by the prosecution. We find improper one set of statements characterizing the jury's role in imposing the death penalty. At the penalty phase, the prosecution told the jury that "you're not killing him," that "[y]ou are part of a shared process," and that "even after you render your verdict, there's a process that continues." These comments suggested that other decisionmakers might ultimately decide whether Floyd received the death penalty. They therefore present concerns under *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985), which held that the Eighth Amendment makes it "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

Nevertheless, these comments did not "so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Id.* at 340. The statements did not quite as clearly suggest to the jury that Floyd would not be executed as did the offending remark in *Caldwell*. *See id.* at 325–26 ("[Y]our decision is not the final decision"; "[T]he decision you render is automatically reviewable by the Supreme Court."). Defense counsel emphasized the jury's responsibility during his closing argument, telling the jurors, "[w]e sit before you and we ask whether or not you're going to kill somebody." Moreover, the jury instructions clearly stated that the jurors "must assume that the sentence will be carried out." This sufficiently avoided any "*uncorrected* suggestion that the responsibility for any

ultimate determination of death will rest with others," so as to not require reversal. *Id.* at 333 (emphasis added).

The prosecution also argued during the penalty phase that the death penalty "sends a message to others in our community, not just that there is a punishment for a certain crime, but that there is justice." This statement inappropriately implies that the jury could sentence Floyd to death to send a message, rather than making "an *individualized* determination." *Zant v. Stephens*, 462 U.S. 862, 879 (1983). The harm of this statement was mitigated in part by jury instructions that emphasized the jury's responsibility to weigh the specific aggravating and mitigating circumstances of the case. Both the defense and the prosecution also repeatedly emphasized and relied on the specific details of the crime at hand, encouraging the jury to make a determination based on the individual facts of the case. Finally, we agree with the district court's holding that, in context, these comments did not "incite the passions of the jurors" and "did not include any overt instruction to the jury to impose the death penalty . . . to send a message to the community." In light of the other arguments made at trial, and the strong evidence against Floyd, the improper argument by the prosecution did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quotation marks omitted).

## VIII.

Floyd advances on appeal two claims outside the certificate of appealability issued by the district court. These uncertified claims challenge Nevada's lethal injection protocol and courtroom security measures that caused certain jurors to see Floyd in prison garb and restraints. We

construe this portion of his briefing as a motion to expand the certificate of appealability. 9th Cir. R. 22-1(e).

A petitioner meets his burden for a certificate of appealability if he can make "a 'substantial showing of the denial of a constitutional right,' accomplished by 'demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Turner v. McEwen*, 819 F.3d 1171, 1178 n.2 (9th Cir. 2016) (first quoting 28 U.S.C. § 2253(c)(2); and then quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). Floyd makes no such showing here, and we therefore deny his motion to expand the certificate of appealability.

First, Floyd's uncertified challenge to Nevada's lethal injection protocol—a three-drug sequence of the anesthetic midazolam, the opioid fentanyl, and the paralytic cisactracurium—is not yet ripe. In 2018, the manufacturer of Nevada's supply of midazolam brought an action to enjoin its product's use in executions. The manufacturer won, obtaining a preliminary injunction, *Alvogen v. Nevada*, No. A-18-777312-B (Nev. Dist. Ct. Sept. 28, 2018), which is currently on appeal to the Nevada Supreme Court. *See State v. Alvogen, Inc.*, Nos. 77100, 77365 (Nev. 2019). As a result, for all practical purposes, Nevada presently has no execution protocol that it could apply to Floyd. A method-of-execution challenge is not ripe when the respondent state has no protocol that can be implemented at the time of the challenge. *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011) (claim unripe because no protocol in place following state court invalidation of existing protocol). We cannot determine what drugs Nevada might attempt to use to execute Floyd, and we cannot adjudicate the

constitutionality of an unknown protocol. Floyd's claim is therefore unripe for federal review because "the injury is speculative and may never occur." *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993) (citation omitted).

Second, Floyd's uncertified and procedurally defaulted argument that his trial counsel was ineffective for failing to challenge various courtroom security measures fails. In Floyd's second state habeas petition and instant federal petition, he contended that his trial counsel failed to object to the trial court's forcing him to appear at voir dire in a prison uniform and restraints. The Nevada Supreme Court dismissed this claim as untimely and successive because it was first raised in Floyd's second state petition, *Floyd v. State*, No. 51409, 2010 WL 4675234, at *1 (Nev. Nov. 17, 2010), and the district court dismissed it as procedurally defaulted. As with Floyd's other defaulted ineffective assistance of counsel claims, because of the underlying claim's weakness, we need not resolve whether the state law under which it was deemed defaulted is adequate or whether Floyd may show cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012).

In light of the overwhelming evidence of Floyd's guilt and the weight of the aggravating factors against him, any reasonable jurist would agree that the courtroom security measures had no substantial effect on the jury's verdicts. *See Walker v. Martel*, 709 F.3d 925, 930–31 (9th Cir. 2013) (reversing the grant of habeas relief on a shackling-related ineffective assistance claim because the prejudicial effect of shackles was "trivial" compared to aggravating evidence against defendant who killed multiple victims during armed robberies); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (holding that when evidence against the

defendant is overwhelming, prejudice from shackling is mitigated).  Even if trial counsel should have objected to the restraints, Floyd was not prejudiced by that failure.  *See Harrington v. Richter*, 562 U.S. 86, 111 (2011) (explaining that *Strickland*'s prejudice prong "asks whether it is reasonably likely the result would have been different." (quotation marks and citation omitted)).

We therefore deny the motion to expand the certificate of appealability as to both uncertified claims.

## IX.

For the foregoing reasons, we **AFFIRM** the district court's denial of habeas relief.